THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALPHONSO TRAVIS, Defendant-Appellant.

First District (3d Division)   Nos. 82—1070, 82—1261 cons.

Opinion filed March 21, 1984.

Sam Adam, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Stephen Erhard Eberhardt, Assistant State's Attor-

neys, of counsel), for the People.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

The minor defendant, Alphonso Travis, was charged with murder. At the time of the occurrence, defendant was 15 years old. Defendant was tried as an adult and was convicted of murder by a jury. He was then sentenced to 35 years in the Department of Corrections. On appeal defendant contends that (1) the court erred in denying his motion to suppress evidence, (2) he was not proved guilty beyond a reasonable doubt, (3) the State's closing argument was highly prejudicial and (4) the court erred in refusing to give his instruction on circumstantial evidence. We reverse and remand.

The victim, Calvin Bond, was shot to death at approximately 1:30 a.m. on September 20, 1980, near the Illinois Central railroad tracks at 84th Street in Chicago, Illinois. The police officers who investigated the incident testified that around 6 p.m. on September 20, they saw defendant at his residence and he went with them to an interview room at the police station. The officers testified that defendant was given his *Miranda* warnings and was then questioned regarding the homicide. The officers stated that defendant was not under arrest at this time. Defendant was at the station for approximately 3½ hours. When defendant was asked where his parents were, he replied that he did not know where they could be reached. The officers made no further attempt to locate defendant's parents. One of the officers testified that defendant denied being involved in the shooting, and that defendant stated that around midnight he had argued with the victim regarding a stereo but he then left the victim and headed home. He heard two gunshots at that time and heard the victim yell something like, "Shoot the gun, this is 82nd Street ***." He did not see who fired the shots.

The police officers also testified that two days later, on September 22, they saw defendant at a laundromat around 3 p.m. Defendant returned to the police station with them. The officers did not attempt to notify defendant's parents that defendant was at the station. Around 9 p.m., after defendant was again informed of his *Miranda* rights, he gave the police a statement in which he said that the statement that he had made two days earlier was untrue. Rather than going home at midnight, he met the victim and Darryl Moody. The three of them walked toward the railroad tracks where Moody said that he had hidden some television sets. When defendant stopped to urinate, the other two continued walking. Defendant then heard several shots and heard the victim scream. Moody came running back, and defendant

started running, too. When they separated, Moody handed defendant a gun and told him to hide it in a crack in the porch where defendant lived. Moody also told defendant that he had shot the victim because he had caused Moody to be arrested on a burglary charge. The police officers also stated that they accompanied defendant to the spot where he had stated that he had placed the gun, but no weapon was retrieved. All of the officers testified that defendant was not physically abused. Defendant left the station after approximately 10 hours.

Defendant testified at the hearing on the motion to suppress. According to defendant, he was on his way home from a bowling alley when he was arrested by the police around 2 p.m. on September 20. He was kept at the station for approximately seven hours, during which time he was denied food and water, and he was handcuffed. He was not permitted to use the telephone, and no one informed him of his *Miranda* rights. Defendant further testified that he was beaten by one of the officers.

In regard to the events on September 22, defendant testified that he was at a laundromat washing his clothes when three officers told him to get in their car, and they took him to the police station. He remained there approximately 12 hours, until 4:30 a.m. He stated that he was allowed to make a phone call to the lady with whom he resided to tell her to get his clothes from the laundromat, but he was not permitted to tell her where he was. As on the 20th, he was denied physical comforts, he was handcuffed, and he was beaten. The police did not advise him of his *Miranda* rights. Defendant denied making a statement on the 20th, and he further testified that he gave the police a statement on the 22d because the police were beating him and they promised him that he could leave after he made a statement. He left the station with his mother, but he did not know who had contacted her.

Defendant was subsequently arrested on December 3, 1980, after Moody's girlfriend, who had fled to Alabama following the shooting, made statements incriminating defendant.

Initially, defendant contends that the trial court erred in denying his motion to suppress the statements that he made to the police. According to defendant, these statements should have been suppressed because they were the product of an illegal arrest, the police failed to administer *Miranda* warnings, the police physically abused him, and the police failed to notify his parents or other interested adult that he was in custody as required by section 3—2(1) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 703—2(1)).

■ On a motion to suppress a confession, the burden of going

forward with the evidence and the burden of proving that the confession was voluntary is on the State. However, the voluntariness of the defendant's statements must be proved by a preponderance of the evidence rather than beyond all reasonable doubt. (See *In re Bizzle* (1976), 36 Ill. App. 3d 321, 325, 343 N.E.2d 633, 637; Ill. Rev. Stat. 1979, ch. 38, par. 114—11(d).) In determining the voluntariness of the defendant's statements, the trial court should follow the totality of the circumstances approach. This approach mandates an inquiry into the circumstances surrounding the interrogation. (*Fare v. Michael C.* (1979), 442 U.S. 707, 724-25, 61 L. Ed. 2d 197, 212, 99 S. Ct. 2560, 2571-72; *People v. Simmons* (1975), 60 Ill. 2d 173, 179, 326 N.E.2d 383, 386.) Thus, no single fact is dispositive, and *Miranda* warnings, by themselves, will not always purge the taint of an illegal arrest or confession. (See *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262-63.) On appeal, the courts must use special care in scrutinizing the record where a juvenile is involved, since juveniles could be "easy victim[s] of the law." (*Haley v. Ohio* (1948), 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 303-04.) Here, we conclude that defendant's statements were not voluntarily made and should have been suppressed.

The State's testimony shows that on September 20, 1980, around 6 p.m., defendant, who was 15 years old at the time of the incident, was asked to accompany the police to the police station for questioning. While at the station for a period of at least 3½ hours, defendant stated that although he had argued with the victim regarding a stereo around midnight, he had left the victim and was heading home when he heard two gunshots and heard the victim yell. Defendant denied being involved in the shooting. When asked by the police where his parents were, defendant replied that he did not know where they could be reached. The police made no further efforts to locate defendant's parents.

Two days later, on September 22, 1980, around 3 p.m., defendant was again asked to accompany the police to the station for questioning. This time defendant gave the statement in which he said that he had been with Bond and Moody, that he had stopped to urinate, and that after he heard shots being fired, he and Moody fled. Around 10 p.m., defendant took the police to the place where he supposedly had put the gun Moody gave him, but no weapon was recovered. Although the officers who had questioned defendant testified that they had not attempted to locate defendant's parents, defendant's mother took defendant home from the police station in the early morning hours. One of the police officers testified that defendant was at the police

station for at least 10 hours.

Based on these facts, we believe that defendant was not lawfully in custody at the time he made the inculpatory statements which placed him at the scene of the crime. We believe that the situation here is similar to that in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, where the court found that the police had violated a juvenile defendant's constitutional rights when, without probable cause to arrest, they took the defendant into custody, transported him to the police station, and detained him there for interrogation. In *Dunaway*, the court referred to the fact that the defendant was not briefly questioned where he was found, but was taken from a neighbor's home to the police station in a police car. He was placed in an interrogation room where he was questioned after being given his *Miranda* warnings. He was not informed that he was free to go. Furthermore, the police made it clear that the defendant would have been physically restrained if he had refused to accompany the officers or had tried to escape. 442 U.S. 200, 212, 60 L. Ed. 2d 824, 835-36, 99 S. Ct. 2248, 2256.

The circumstances here are analogous to those in *Dunaway*. Defendant was not questioned at all before being "asked" to accompany the officers to the police station. The first such request was made of defendant when he was at or near the place where he was residing. The second request was made as defendant stood outside a laundromat where he was doing his laundry. Both requests resulted in defendant being placed in an interrogation room, read his *Miranda* rights, and then questioned for several hours. The Supreme Court has "consistently recognized [that] the coerciveness of the custodial setting is of heightened concern where *** a juvenile is under investigation." (*Fare v. Michael C.* (1979), 442 U.S. 707, 729, 61 L. Ed. 2d 197, 215, 99 S. Ct. 2560, 2574 (Marshall, J., dissenting).) Although the police officers testified that defendant was free to leave, this fact was never conveyed to defendant. Nor do we believe that defendant's statement that he "voluntarily" accompanied the officers is controlling. The assistant State's Attorney inferentially admitted in his argument at the suppression hearing that defendant could not have left of his own volition. The assistant State's Attorney stated that the police "actually did pick [defendant] up," and that "they did read him his *Miranda* warnings ***. Because they knew that he was going to be the target [of the investigation]." When the court shortly thereafter asked, "You are not saying that [defendant] was there, he was there voluntarily, and therefore the Miranda rights were not required?" the assistant State's Attorney replied, "No, Judge, he was picked up by

the Police and brought in." Moreover, as in *Dunaway*, the circumstances here make it evident that the purpose behind the officers' actions, " '*** both in design and in execution, was investigatory. The [officers] embarked upon this expedition for evidence in the hope that something might turn up.' " (*Dunaway v. New York* (1979), 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258, quoting *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.) Also, here the assistant State's Attorney admitted at the suppression hearing that the police lacked probable cause to arrest defendant. Thus, it is clear that the police acted illegally when, without probable cause, they seized defendant and took him to the police station.

▆ The State correctly points out, however, that the illegality of an arrest does not *per se* render an inculpatory statement inadmissible. (*People v. Tankson* (1980), 92 Ill. App. 3d 328, 331, 415 N.E.2d 1218, 1221.) We recognize that where a defendant's detention is found to be illegal, the question remains as to whether the connection between the unconstitutional police conduct and the incriminating statements was sufficiently attenuated so that the statements could be introduced at trial. (*Dunaway v. New York* (1979), 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258.) In *Dunaway*, regarding the fact that it was undisputed that the defendant had been given *Miranda* warnings, the court pointed out that "although a confession after proper *Miranda* warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis." (442 U.S. 200, 217, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259.) Beyond this threshold, the test articulated in *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62, to vindicate the distinct policies and interests of the fourth amendment must be applied. Under *Brown*, the factors to be considered include the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. Applying the *Brown* test to the facts before it, the *Dunaway* court concluded that there were no intervening events to break the connection between the defendant's illegal detention and his confession. The court based its conclusion on the facts that the defendant was seized without probable cause in the hope that something might turn up and that he confessed without any intervening event of significance. A similar conclusion is mandated by the circumstances in the present case, and here, the illegal conduct occurred not once but twice.

Accordingly, defendant's statements should have been suppressed on the basis that the State failed to prove that they were not the product of an illegal arrest. (See *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.) Otherwise, "[t]o admit [defendant's statements] in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.' " *Dunaway v. New York* (1979), 442 U.S. 200, 219, 60 L. Ed. 2d 824, 840, 99 S. Ct. 2248, 2260, quoting Comment, 25 Emory L.J. 227, 238 (1976).

Another factor contributing to our decision that defendant's statements should have been suppressed is the failure of the police officers to make a reasonable attempt to notify defendant's parents that defendant was in custody. Section 3—2(1) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par.703—2(1)) provides:

> "A law enforcement officer who takes a minor into custody \* \* \* shall immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where he is being held; and the officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed. \* \* \*"

■ While defendant urges that we should follow the lead of other jurisdictions and rule that any incriminating statements made by a juvenile who is in custody should be inadmissible at trial by virtue of section 3—2(1) unless he has at least had an adequate opportunity to have the advice of a lawyer, parent, or person with whom he resides prior to making his statement,[1] we are precluded from adopting defendant's position in view of the fact that the Illinois Supreme Court has made it clear that the voluntariness of a juvenile's confession will be determined by the totality of the circumstances. (See *In re Stiff* (1975), 32 Ill. App. 3d 971, 978, 336 N.E.2d 619, 625.) Moreover, in *People v. Zepeda* (1970), 47 Ill. 2d 23, 265 N.E.2d 647, the court stated that the Juvenile Court Act did not provide for sanctions where there was a failure to reasonably comply with section 3—2(1). However, we do not believe that this means that the failure to comply

---

[1]See, *e.g., Lewis v. State* (1972), 259 Ind. 431, 288 N.E.2d 138; *In re Dino* (La. 1978), 359 So. 2d 586; *Commonwealth v. Smith* (1977), 472 Pa. 492, 372 A.2d 797.

with section 3—2(1) is not an important consideration in determining whether a juvenile defendant's statements were voluntary under the totality of the circumstances.

In *Zepeda*, the court found that the juvenile defendant's statements had been voluntarily given and were obtained with due regard for the defendant's constitutional rights. There, the defendant made an admission establishing his legal accountability for the crime within 30 minutes of arriving at the station. The statements were reduced to a signed writing within another 35 minutes. Subsequently, a juvenile officer drove defendant, another youth and one of the arresting officers to the State's Attorney's office, where the defendant gave a second signed statement. The record showed that the juvenile officer was present when this statement was obtained, although it was not clear whether he had been present for the earlier statements.

In contrast to *Zepeda*, the defendant in the present case was illegally detained not once but twice. It is unclear at what point defendant made his statements during his lengthy detentions. Although the police officers knew that defendant was a juvenile, they made no effort to locate defendant's parents beyond asking defendant where they could be reached.

We can only conclude that the absence of an adult interested in defendant's welfare as envisioned by section 3—2(1) contributed to the coercive circumstances surrounding defendant's interrogations. Although the trial court found that defendant was given *Miranda* warnings, there is scant evidence in the record to support the conclusion that defendant knowingly waived his rights under the fifth amendment. Defendant was only 15 years old at the time of his interrogation. There is no testimony regarding his intellectual capacity. He was questioned twice by the police at the police station for substantial periods of time. After he was given *Miranda* warnings, he was merely asked whether he understood them. He did not sign a waiver of rights form at either of the two interrogations, nor did he sign any written statements. Further, it is evident that at the time defendant was questioned, although he was the focus of the police investigation, the police lacked probable cause to arrest him.

Under the circumstances, the failure of the police officers to make any reasonable attempt to locate defendant's parents becomes a consequential fact. The police were attempting to coerce defendant into making incriminating statements, and their admitted failure to even attempt to notify an adult interested in defendant who could have ensured that defendant understood the extreme importance of the constitutional rights which he allegedly waived without hesitation under-

scores our conclusion that the State failed to prove that defendant's statements were voluntary under the totality of the circumstances. Accordingly, the trial court erred in denying defendant's motion to suppress defendant's statements at the police station, and defendant's conviction must therefore be reversed.

In view of our decision that defendant is entitled to a new trial, the only other issue we need to address is whether the evidence, if believed, would have been sufficient to prove defendant guilty beyond a reasonable doubt. Defendant points out that the heart of the State's case was the testimony of Valerie Dickerson, who was 14 years old at the time of trial. The gist of her testimony was at the time of the occurrence, she was living with the Moody family. She was in love with Moody, and defendant and the victim were her friends. She overheard Moody and defendant talking about killing Bond. Later, she saw defendant, Moody and Bond at the corner of 83d and Ellis, and she saw defendant put a gun to Bond's head. She then saw Bond run up the stairs, and Moody and defendant, who both had guns, were chasing him. She heard four or five gunshots as she returned to Moody's house. Around 10:30 a.m., she saw defendant talking to a drunken derelict, and she later overheard defendant tell Moody that he had sold his gun to a wino. Later that day she flew to Alabama to live with her grandmother because she was afraid that Moody would kill her.

Defendant characterizes Dickerson's testimony as that of a "mixed up, lovesick child," and concludes that "[t]o predicate a conviction *** on this child's imaginings is simply beyond the pale." However, Dickerson's youth and bias were made clear to the jury, whose duty it was to determine her credibility. We believe that Dickerson's testimony, in addition to the other evidence, was sufficient for a jury to conclude that defendant was guilty beyond a reasonable doubt. This does not mean that we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather, our consideration of the sufficiency of the evidence protects defendant's constitutional right against double jeopardy as mandated by *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375. See *People v. Clark* (1980), 84 Ill. App. 3d 637, 642, 405 N.E.2d 1192, 1195-96.

Accordingly, the judgment is reversed and the case is remanded for a new trial.

Reversed and remanded.

McNAMARA and WHITE, JJ., concur.