THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES EALY, Defendant-Appellant.

First District (5th Division)   No. 84—649

Opinion filed March 31, 1986.

558

Robert L. Graham and Randall E. Mehrberg, both of Jenner & Block, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Donald G. Schweihs, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a jury trial, defendant James Ealy was found guilty of four counts of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and sentenced to natural life imprisonment in the Illinois Department of Corrections, the sentence to be served consecutively with a previously imposed 23-year sentence on a conviction for rape. On appeal, defendant argues that: (1) based on the ground that his arrest was illegal, the trial court erred in denying his motions to suppress his confession and evidence obtained as a result of two searches of his residence; (2) the State's failure to produce photographs and a microanalyst's notes during discovery violated his right to due process; and (3) the prosecutor's improper remarks during closing rebuttal argument constituted reversible error. For the reasons set forth below, we reverse and remand.

The record reveals that at the hearing on defendant's motions to suppress, the following testimony was presented. On August 16, 1982, at approximately 12:55 p.m., Chicago Police Officer Dennis Vavrin discovered the bodies of Christine, Mary Ann, Cora and Jontae Parker in their seventh floor apartment located in the Rockwell Gardens housing project at 2515 West Jackson, in Chicago. Christine, the 33-year-old

mother of 15-year-old Mary Ann and 13-year-old Cora, was found in a bedroom of the apartment. Mary Ann and her 3-year-old son, Jontae, were discovered in the bathroom. Cora was found in a closet, next to the bathroom. All of the victims bore ligature marks around their necks, with the exception of Mary Ann who was discovered with a green cloth wrapped around her neck. A later examination of the premises by police evidence technicians revealed no fingerprints suitable for comparison. Dr. Robert Stein, the Cook County medical examiner who had been called to the scene, pronounced the victims dead and their bodies were removed from the apartment.

Shortly thereafter the police conducted a canvas of the building residents. Police officers went to defendant's mother's apartment located on the fourth floor and questioned her. Defendant, who was 17 years old, was present at that time but was not questioned. Later that afternoon, the police returned to Mrs. Ealy's apartment and spoke with defendant, who told them that he had dated Mary Ann Parker until earlier that year, he knew the other Parkers and that he did not know anyone who might have killed them. At approximately 11 p.m., several police officers reappeared at the apartment asking to see defendant and, finding he was not at home, told Mrs. Ealy to have him call them if he had any more information regarding the Parker homicides.

The next day, August 17, autopsies were performed on the victims by Dr. Stein. In attendance was Detective Thomas Blomstrand of the Chicago police department. Dr. Stein's examination disclosed that each victim had died as a result of ligature strangulation. His examination of Mary Ann revealed that the green cloth around her neck was a leg portion of a pair of green surgical pants. After removing the cloth from Mary Ann's neck, Dr. Stein also discovered a piece of tan material knotted on the right side and tied tightly around her neck. His examination of Jontae further revealed that he had been raped.

Thereafter, Detective Blomstrand reported to Area 4 police headquarters and communicated Dr. Stein's findings to other detectives present at a 5 p.m. roll call. Detectives Terrence Thedford and Patrick Harrington were among those in attendance. They were assigned to interview two of five individuals, one of whom was defendant, who were known to frequently watch television in the victims' apartment. Thedford and Harrington arrived at defendant's residence, without a warrant, allegedly at 9 p.m. They identified themselves to Mrs. Ealy, stated they were working on the Parker homicides and asked to speak with defendant. Mrs. Ealy invited them in and sent

her younger son to get defendant, who was outside on the playground area of the building. When defendant arrived, the detectives asked him if he would come to the police station with them. Both detectives testified that they did not tell defendant that he had to go with them, and defendant never indicated that he did not want to go with them. On direct examination of defendant, defense counsel orally made an offer of proof that defendant would testify that "he felt they [the detectives] would force him to go if he didn't cooperate" and "that one of the officers was standing by the door, blocking the door from his exit."

They then left the apartment—one detective in front of and one in back of defendant. Defendant was not handcuffed and the officers "did not pull their guns on him." He was transported to the police station in a squad car which was equipped with a wire screen between the front and rear seats and which lacked handles to the windows and doors in the rear.

Upon arriving at the Area 4 station at approximately 9:40 p.m., the detectives placed defendant in a second-floor interview room, but did not give him *Miranda* warnings at that time. The room was windowless and contained a table and three chairs. The officers left defendant in the room for 20 minutes, then returned and interrogated him for 30 minutes, asking him to account for his whereabouts during the early morning hours of August 16. Determining that some discrepancies existed between defendant's account of his activities and the one previously given by his mother, the detectives left the room to discuss the inconsistencies. While out of the room, they became aware of the presence of Mrs. Ealy and told her about the inconsistencies between defendant's and her account of defendant's whereabouts on August 16. Contrary to Mrs. Ealy's testimony, they then asked Mrs. Ealy if she would speak to defendant about his story and she agreed. Contrary to defendant's testimony, they further testified that they asked defendant if he would speak with his mother and that he refused to do so.

Shortly thereafter, Thedford and Harrington were informed by another detective that defendant recently had been arrested for a rape which occurred in the same building where defendant and the Parker family lived. After reviewing the case report of that rape, Thedford and Harrington returned to the interview room at approximately 11 p.m. and gave defendant *Miranda* warnings. Defendant said he understood his rights and the officers interrogated him for another 30 minutes. During that time, defendant was asked and agreed to sign a consent to search his bedroom. The detectives did not seek

to obtain a search warrant. The officers also testified, contrary to Mrs. Ealy's testimony, that she had agreed to sign a consent to search form.

The next shift of detectives, Ralph Vucko and Victor Switski, were informed by Thedford and Harrington of the status of the investigation. Detective Vucko testified he prepared a consent to search form for Mrs. Ealy's signature. At approximately 1:30 p.m. on August 18, after finding that Mrs. Ealy had left the station, Vucko and Harrington took the form into the interview room. Vucko stated he asked defendant to sign the consent form after reading its contents to him and advising him that he was waiving "his right to the police having to have a search warrant to look in [his] house." Defendant, however, testified that although he signed the form, its contents were not read to him and he did not read it.

At approximately 1:45 a.m., Detectives Vucko and Switski arrived at defendant's residence. They testified they showed Mrs. Ealy the consent to search form signed by defendant, she permitted them to enter the apartment, and she showed them to defendant's bedroom. Mrs. Ealy, however, testified that the detectives asked her to sign a consent form, she asked them if it was a search warrant, they said no, and she said she would not sign it. She stated that they then pushed her aside, entered the apartment and went into defendant's bedroom. The detectives subsequently found a "bundle" underneath defendant's bed. It contained numerous items, including two lengths of khaki-type material, one of which was knotted at each end and the other with one knot in it. Other items found in the bundle were a bone-colored knife handle, a green pair of surgical pants, some bed sheets with red stains, a child's sweater, and a red sock. Vucko took the khaki material and some shoelaces he had found in defendant's dresser.

The detectives then left the apartment and went to Detective Blomstrand's home. They showed him the khaki material taken from the bundle and he told them it looked like the same material he had observed around Mary Ann Parker's neck at the autopsies he attended. Vucko and Switski then returned to the Parkers' apartment. Vucko discovered a khaki-colored trench coat in a closet and noticed that although the coat had belt loops, the belt was missing. He also found a knife blade in the closet which appeared to him to match the handle he had seen in the bundle in defendant's bedroom. Vucko took both items and he and Switski returned to the police station, arriving at approximately 4 a.m. on August 18. At that time, Switski testified that he went to the interview room occupied by defendant and locked

the door.

At approximately 5 a.m., Vucko and Switski entered the interview room. Detective Thedford also entered, "took defendant's underwear and gym shoes" away from him and then left. Defendant was again given his *Miranda* rights, he indicated he was willing to further discuss the Parker homicides, and the officers confronted him with the items they had recovered from his bedroom and the Parker crime scene. Thereafter, defendant told the officers that on August 15, at about 11:30 p.m., he was near the Parkers' apartment and saw a large black man running from the apartment carrying a large bundle which he dropped. After picking up the bundle, defendant went into the Parkers' apartment and found the victims' bodies. He said he then left the apartment, taking the bundle with him to his mother's apartment, placed the bundle under his mother's bed and went to sleep. Defendant, however, later denied giving this account to Detectives Vucko and Switski. Defendant also denied that he signed a second consent to search form at the end of this interrogation session, even though he later acknowledged his signature on the form which was admitted into evidence.

At approximately 6 a.m., Detectives Vucko and Switski went to defendant's residence bearing the second consent form. They testified that they showed Mrs. Ealy the consent form and told her that they were there to pick up the rest of the items which were left in the bundle. Contrary to Mrs. Ealy's testimony, Vucko and Switski stated that she permitted them to enter the apartment and to take the items. Mrs. Ealy testified that the detectives shoved her, entered her apartment and went into defendant's bedroom. Finding that the bundle had been removed from its previous location, they told Mrs. Ealy to bring it to them, she did so, and they left.

Vucko and Switski returned to the Area 4 station with the bundle and interviewed defendant again at approximately 9:30 a.m. on August 18. Switski gave defendant *Miranda* warnings, and Detective Vucko then told defendant that his previous story did not make sense. At that point, defendant became excited, started crying and said he "would tell the truth." Vucko and Switski stated that defendant then told them that on August 15 he had been drinking with friends. He later went to the Parkers' apartment at approximately 11:30 p.m. and several members of the Parker family "made fun of his red eyes." Defendant then described to the detectives how he strangled the four victims.

Thereafter, Detective Switski called the State's Attorney's office, and Assistant State's Attorney Christine Campbell arrived at Area 4

at 10:45 a.m. After explaining her position to defendant and giving him *Miranda* warnings, defendant repeated his confession to her and agreed to make a written statement. At 1 p.m., defendant signed a waiver of his constitutional rights, his statement was taken down by a court reporter and at approximately 2:30 p.m. he signed the statement. At 3 p.m., defendant was allowed to see his mother. She had arrived at the station at approximately 10 a.m. and had been told she had to wait before seeing defendant. During that time, Mrs. Ealy called Beverly Bearden, a case worker volunteer for Catholic Charities, who arrived at the station at 2:30 p.m. and was also told she would have to wait to speak to defendant.

Defendant testified that when he spoke with his mother and Bearden, he told them he confessed because he "couldn't take it" any more. He stated that he had not had anything to eat or drink throughout his detention, that the officers would not permit him to sleep and that they would not let him leave. Defendant further stated that he had been repeatedly "punched in the ribs" by an unidentified officer and threatened that he would not be able to sleep or to see his mother until he signed a confession. He also stated that he in fact did not kill the Parkers, that he had been high on wine when he found a bundle by the garbage chute on the seventh floor where the Parker apartment was located, that he had used the bundle as a basketball, tossing it into garbage cans as he made his way down to his mother's apartment on the fourth floor, and that he went home to sleep when he reached his mother's apartment, tossing the bundle on the floor of his bedroom.

At the conclusion of the evidence, the trial court denied the motions to suppress defendant's confession and evidence obtained as a result of the two searches. The court also subsequently denied defendant's motion to exclude the photographs and microanalyst's notes pertaining to the evidence obtained from the searches, but advised defense counsel that he could again raise his objection to this evidence at trial.

At trial, the witnesses' testimony was virtually the same as their testimony at the suppression hearing. Defendant, however, did not testify. In addition, when defense counsel again raised his objection to admission of the photographs and the microanalyst's notes, the motion was denied. Defendant's motion for a mistrial, citing alleged prejudicial and inflammatory statements made by the State in closing rebuttal argument, was also denied, as was his post-trial motion.

On appeal, defendant contends that the trial court erred in denying his motions to suppress his confession and the evidence obtained

as a result of the two searches of his bedroom. Specifically, defendant argues that the police, lacking probable cause, arrested him at the time they took him from his residence and, therefore, his confession and other incriminating evidence were the fruits of an illegal arrest, requiring suppression.

■■ ■ Probable cause exists if the facts and circumstances known by the arresting police officers are sufficient to cause a reasonable man to believe that an offense has been committed and that the defendant has committed the offense. (*People v. Creach* (1980), 79 Ill. 2d 96, 101, 402 N.E.2d 228.) An arrest occurs when the police detain a person in a manner such that a reasonable, innocent person in the same situation would not consider himself free to go. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.) All evidence directly traceable to an arrest made without probable cause must be suppressed where there are no intervening events to break the connection between a defendant's illegal detention and the evidence obtained as a result therefrom. *People v. Travis* (1984), 122 Ill. App. 3d 671, 676, 462 N.E.2d 654.

■ Here, the State concedes that no probable cause to arrest defendant existed at the time he was taken from his residence, but argues defendant was not "seized" at that time so as to require probable cause. Instead, the State argues that defendant was not considered under arrest until 4 a.m., at which time probable cause existed, and that defendant's consent to the searches and his confession were voluntarily made. In support of its contention that defendant was not seized at the earlier time, the State relies on *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979, and *People v. Gale* (1979), 72 Ill. App. 3d 23, 390 N.E.2d 921. We find these cases unpersuasive.

In *Reed*, police officers investigating a murder and robbery did not ask the defendant if he wanted to be questioned at his apartment, but instead asked him to accompany them to the police station. At the station, the defendant was given *Miranda* warnings and, after four hours of interrogation, confessed to the crimes. In *Gale*, the defendant, was asked to accompany an officer to the police station regarding a theft investigation. At the station, the defendant was given *Miranda* warnings, but was not told he was under arrest. After being interviewed for 30 minutes, he confessed to committing the theft. Both the *Reed* and *Gale* courts concluded that the defendants were not illegally arrested because a reasonable, innocent person in the same position as defendants would not have considered himself under arrest.

The circumstances of defendant's detention in the present case

greatly differ from those in the *Reed* and *Gale* cases. Here, defendant was continuously interrogated for an 18-hour period during which time he was deprived of the basic necessities of life. For 18 hours defendant had nothing to eat or drink and disputedly was not allowed to sleep. Only once during the entire time was a restroom made available to him. On the other hand, in *Reed* and *Gale*, the defendants were only detained for four hours and 30 minutes, respectively, and were not subjected to the deprivations defendant here endured. We further note that the *Reed* court, in fact, specifically considered the absence of a continuous, lengthy interrogation in concluding that Reed had not been illegally arrested.

We find that the circumstances in the present case are more analogous to those in *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, *cert. denied* (1982), 459 U.S. 878, 74 L. Ed. 2d 143, 103 S. Ct. 174. There, as here, the defendant was questioned over a lengthy period of time by the police. On the basis of a vague physical description given by a rape victim, the police asked the defendant to accompany them to the police station instead of questioning him at his home. At the station, he was placed in an interview room and interrogated five times during a 12-hour period, during which time he was repeatedly given *Miranda* warnings. The police obtained the defendant's consent to search his home and car, they never told him he was free to leave and they subsequently obtained a confession from him. The *Townes* court, relying on the apposite case of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, held that the defendant's detention resembled a traditional arrest and the circumstances indicated that a reasonable person in the same position as the defendant would not have believed he was free to leave. The court also held that the seizure of the defendant had an improper "quality of purposefulness" in that it appeared that the police were conducting an "expedition for evidence" in the hope of obtaining sufficient information upon which to predicate the probable cause necessary for an arrest. *People v. Townes* (1982), 91 Ill. 2d 32, 37-38; *Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259.

We believe the circumstances in the instant case present far more compelling reasons than *Townes* for requiring reversal of the trial court's judgment. Here, in addition to the obvious similarities of this case and *Townes*, the police continuously interrogated defendant eight times during an 18-hour period—three interrogation sessions more and six hours longer than the interrogation of the defendant in *Townes*. Throughout his 18-hour detention, as previously noted,

defendant also was deprived of the basic necessities of life. He was not offered anything to eat or drink for 18 hours. A restroom was made available to him on only one occasion during his detention. Although it is disputed whether defendant was permitted to sleep during this time, we note that if in fact he did so he would have had to sleep on the floor or sitting up, since there was no bed in the room. In addition, any sleep that defendant may have gotten would have been, at best, minimal due to the interruptions created by the repeated interrogation sessions which usually lasted at least 30 minutes each, *i.e.*, 11 p.m., 1:30 a.m., 5 a.m., 9:30 a.m., 10:45 a.m., 1 p.m. and 2:30 p.m. Finally, we note that defendant was subjected to having his underwear and gym shoes, which he had been wearing, taken away from him prior to giving any confession.

Under the totality of the circumstances, we conclude that defendant's detention, like that of the defendant in *Townes*, resembled a traditional arrest and indicates that a reasonable, innocent person in defendant's position would not have believed he was free to leave. We also find that the unconstitutional misconduct of the police was a purposeful expedition for evidence in the hope of obtaining sufficient information upon which to predicate the probable cause necessary for defendant's arrest. We note that even though the detectives stated they had probable cause to arrest defendant at 4 a.m. as a result of the evidence obtained from their first search of his bedroom, they nonetheless did not call in an assistant State's Attorney at that time, but instead interrogated defendant two more times until obtaining a second consent to search form and a confession from him at 9:30 a.m. Accordingly, since the police lacked probable cause to arrest defendant at the time they took him from his residence, which the State concedes, we hold that defendant was illegally seized in violation of the fourth amendment.

■ We recognize, although the State does not so argue, that the illegality of an arrest does not *per se* render incriminating evidence inadmissible where there are intervening events to break the connection between a defendant's illegal detention and the evidence obtained as a result therefrom. (*People v. Travis* (1984), 122 Ill. App. 3d 671, 676, 462 N.E.2d 654.) Under the facts and circumstances of the instant case, clearly no intervening events occurred. Accordingly, defendant's confession and the evidence obtained as a result of the two searches required suppression since the taint of the illegal arrest was not dissipated.

■ In light of the above disposition, we need not address defendant's further contentions raised on appeal. We feel compelled, how-

ever, to comment on the State's closing rebuttal argument because similar remarks complained of by defendant could recur at retrial. We find that a number of the State's remarks were grossly improper, prejudicial, inflammatory and designed to arouse the passions of the jury against defendant. These remarks could not possibly aid the jury in weighing or evaluating the evidence. (*People v. Potenik* (1950), 407 Ill. 337, 348, 95 N.E.2d 414.) "[N]o matter how reprehensible [a defendant's crime], 'be he sinner or a saint, [he] has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged.' " (*People v. Hope* (Feb. 21, 1986), No. 58462, slip op. at 9, quoting *People v. Gregory* (1961), 22 Ill. 2d 601, 606, 177 N.E.2d 120.) We accordingly so admonish the State.

■ Finally, we believe that the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

LORENZ and PINCHAM, JJ., concur.