THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOHN ARIAS, Defendant-Appellee.

Third District No. 3—88—0288

Opinion filed February 28, 1989.

Edward F. Masters, State's Attorney, of Joliet (Terry A. Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Mary E. Rosiek, of Kozlowski, Polito & Feeley, of Joliet (Joseph C. Polito, of counsel), for appellee.

JUSTICE STOUDER delivered the opinion of the court:

Pursuant to Supreme Court Rule 604(a)(1) (107 Ill. 2d R. 604(a)(1)), the State appeals from the judgment of the circuit court of Will County, granting the defendant's motion to quash his arrest and to suppress evidence obtained following the arrest. At the suppression hearing, Joliet police officer Brenczewski testified that he was an investigator assigned to the case involving Willie Ray, who was shot to death on December 6, 1987. Having interviewed several people, the officer learned that two rival gangs were playing football when they spotted the victim, who was wearing his hat in a manner which indicated that he belonged to a different gang. Someone waved a gun at the victim, he ran, and the group chased after him. The defendant, John Arias, was a member of that group. When the group caught up with the victim, Edgar Pacheco fired a shot at him. Other shots were fired, and Arias was seen leaving the area where the shots were fired. The officer also learned that Arias subsequently gave a .38 caliber handgun, which smelled as if it had recently been fired, to another boy. The victim was shot with a .38 caliber handgun.

The officer interviewed Arias on December 9, 1987, at the police station. The defendant had agreed to come to the police station to answer questions. At that time Arias admitted that he was at the football field and chased the victim with a group of other men. However, he told the officers that he lost sight of the victim, heard shots, and walked away.

Brenczewski further testified that he subsequently met with Officers Boucher and Hulbert on December 16, 1987, at approximately 3 or 4 p.m. He discussed with the officers that he felt that he had probable cause to arrest Arias and informed Boucher that Arias should be questioned further in reference to the Willie Ray case. He did not tell Officer Boucher either to arrest or not to arrest the defendant. They did not have a warrant for Arias' arrest at that time, but nothing prevented them from procuring such a warrant. They had already arrested Edward Pacheco, pursuant to an arrest warrant signed before a judge.

At approximately 4:45 p.m., Officers Boucher and Powers went to Arias' home to ask him to accompany them to the police station for questioning. Upon their arrival at the defendant's residence, a second-floor apartment of a two-unit apartment building, the officers proceeded to the back of the building to the only entrance of the upper

apartment. The officers ascended the outside staircase, opened and entered the porch door at the top of the stairs and proceeded to knock on the door of the house. When the defendant's 27-year-old brother, Mario, answered the door, the officers identified themselves as police officers and asked if the defendant was home. They told Mario that they had more questions to ask the defendant. Mario invited the officers into the house and beckoned the defendant.

When the defendant appeared, Officer Boucher asked him if he would accompany the officers to the Joliet police department because the police wanted to talk to him further regarding the Willie Ray incident. The officers did not order the defendant to accompany them and did not threaten him in any way. Arias responded, indicating that he would have to get his coat and then wash his hands, which actions he did under the supervision of the officers. Arias asked the officers how long he would be at the police station. Boucher indicated that it would probably take an hour or two. Both the defendant and his girlfriend, who was present at the time, testified that Arias was denied permission to call his father. They further testified that he was denied permission to wait for his father, who would be returning around 6 p.m. Officer Powers testified that the defendant did not ask to call or to wait for his father.

The defendant's mother, who did not speak English, was present. The defendant asked his mother for a quarter to call his father from the station, but the officers indicated that the defendant could use their phone if he needed to make a call. Arias testified that he felt that he had to go with the officers but thought that he would be returning in a couple of hours.

Officer Boucher gave his calling card to Mario and asked him to explain to the defendant's mother that they wanted the defendant to come with them to the police station for a couple of hours. Mario spoke to his mother in Spanish, his mother nodded her head affirmatively, and Mario said that it was okay.

After the officers left with the defendant, the three all helped push a car, which was stuck because of snow and ice, from the driveway before getting into the unmarked squad car and proceeding to the station. Arias was not handcuffed as he left his residence, and the officers did not have hold of his arm. Boucher further testified that Arias was free to leave and would have been allowed to leave if he had asked to do so.

Upon their arrival at the station, Arias was formally arrested by Officer Hulbert, who then gave the defendant *Miranda* warnings and proceeded to interview him. Arias testified that he asked at this point

if he could call his father but was not permitted to do so. Arias admitted that no promises or threats were given to him, and he agreed to be interviewed. The interview began at approximately 5:12 p.m. Arias testified that an hour into the interview he repeated his request to call his father but was again denied permission. Officer Hulbert did not inform the defendant's parents that the defendant had been arrested.

The defendant told Hulbert that he was playing football with friends when someone pointed out a black guy with his hat tilted to indicate that he was a Black Gangster Disciple. He further stated that while the others chased the victim, the defendant stayed at the football field. Hulbert testified that he interviewed the defendant for approximately 30 to 40 minutes before Officer Brenczewski took over.

Prior to Brenczewski's interview, Officer Hulbert told Brenczewski that the defendant said that he had been playing football on the day in question and denied being at the shooting. During Brenczewski's interview, the defendant at first said that he was not involved in the shooting of Willie Ray. After further questioning, however, the defendant admitted that he had a .38 caliber revolver with one round in it. He told Officer Brenczewski that he had come up behind Edward Pacheco, that he saw Pacheco pull out and shoot a gun, and that he, the defendant, then shot a round at the victim while the victim was on the ground. During this interview, the defendant never indicated that he did not want to talk to Officer Brenczewski. The interview lasted from 45 minutes to an hour, and a taped statement was made of the defendant's confession between 8:58 and 9:02 p.m.

Boucher testified that he had called the defendant's father at approximately 8 that evening. During the phone call, Boucher told the defendant's father that they were still talking to the defendant, that the defendant would likely be detained, and that the officer would call the defendant's father back. Boucher did not tell the defendant's father at that time that the defendant had already been placed under arrest.

Arias testified that the police called his father at approximately 9 p.m., and he spoke with his father at that time. He did not know whether his father had been called earlier. The officers informed his father that he had been placed under arrest and that he would be detained. The defendant's father, Miguel, testified that he received only one phone call from the police sometime after 6 p.m. and was told at that time that his son had been arrested.

Following the presentation of evidence, the defendant's concession that the officers had probable cause to arrest, and arguments, the

trial court quashed the arrest and suppressed Arias' confession. The court found that the defendant was arrested commencing from his departure from his home. The court then concluded that the officers violated the defendant's constitutional rights as outlined in *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, and *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677, in that they entered the exterior door of the porch without a warrant, without exigent circumstances and without consent. Having further found that there was not sufficient attenuation between the defendant's arrest and his confession, the trial court suppressed the confession. The State then brought this appeal.

■ The Supreme Court of the United States in *Payton* held that the fourth amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." (445 U.S. at 576, 63 L. Ed. 2d at 644, 100 S. Ct. at 1375.) The Supreme Court of Illinois in *White* extended the rule of *Payton*, concluding that the suspect's "home" for purposes of fourth amendment protection could be any place where the suspect dwells with the intent to remain there indefinitely. (*White*, 117 Ill. 2d at 210-12, 512 N.E.2d at 682-83.) In this case the defendant argues and the trial court concluded that the officers' entry of the porch violated the defendant's rights as described by the courts in *Payton* and *White*. We disagree.

■ Initially, we note that the porch in this case does not possess the characteristics concomitant to the "home" described by the court in *White*. Neither the defendant nor anyone in his family dwelled on the porch with the intent to remain there indefinitely. On the occasion of the officers' entry, the porch was, in fact, functionally and structurally different and distinct from the house. As Mario testified, the porch functioned as a storage place for furniture and other things which were not being used. The porch is surrounded by windows, and its entry door is only a single-screen door. The door between the porch and the house on the other hand is a heavy wooden door with two key locks and a "peek" hole. The only window between the porch and the house is covered by a shade and is blocked on the inside of the house by a large dining-room cabinet. There is no doorbell on the outside door, and the screen door at the time of the officers' entry was not locked. Mario testified that a knock on the outside door usually could not be heard from inside. While several people were in the house when the officers arrived, the porch was unoccupied. From these facts it appears that the expectation of privacy on the porch was relatively slight compared to that enjoyed within the house.

■ Moreover, we emphasize the fact that the officers here did not enter the porch in order to search the porch or to effect an arrest on the porch. They entered the porch merely to knock on the door of the house—to make their presence known. The officers' actions are not proscribed under the fourth amendment; on the contrary, their actions are encouraged by the requirement that officers knock on the suspect's door and announce their presence. (*People v. Marinez* (1987), 160 Ill. App. 3d 349, 353, 513 N.E.2d 607, 610.) Their entry of the porch to knock on the interior door was no more intrusive than that of a man delivering packages, "a boy collecting for the newspaper or a little girl selling girl scout cookies." (*People v. Jones* (1983), 119 Ill. App. 3d 615, 622, 456 N.E.2d 926, 933). Other State supreme courts have held that the entry by police officers into an enclosed back porch in order to knock on an interior door did not violate the principles of reasonableness imposed upon those conducting government searches and seizures. (*Commonwealth v. McDonnell* (1986), 512 Pa. 172, 516 A.2d 329; *State v. Prudhomme* (Minn.1979), 287 N.W.2d 386).) Like the officers' entries in those cases, the officers' entry in this case was not unreasonable under the circumstances. (*People v. Abney* (1980), 81 Ill. 2d 159, 173, 407 N.E.2d 543, 549 ("The guiding principle is reasonableness under constitutional provisions governing searches and seizures").) Accordingly, we conclude that the trial court erred in holding that the police violated the defendant's rights when they entered the porch to knock on the door of the house.

The defendant argues that even if their entry of the porch was permissible, the officers' entry of the apartment itself violated the defendant's rights. The defendant asserts that Mario's consent is vitiated by the fact that the officers did not tell Mario their true intention, which was to arrest the defendant. We disagree. The entry into the defendant's home by Mario's invitation was effected with no more subterfuge than was used by the officers in *People v. Moore* (1981), 105 Ill. App. 3d 264, 434 N.E.2d 300. In that case, police officers, having probable cause to arrest the defendant, went warrantless to the defendant's apartment, where they met the defendant's wife. The officers told her that they knew her husband did not commit the robbery they were investigating but wanted to talk to him because they thought that he knew who did. Later, the officers called the defendant, asking him to come to the station to answer some questions. When the officers returned to the defendant's house, the defendant accepted the officers' invitation to ride with them to the station, where he was arrested. The defendant asserted that the arrest was invalid under *Payton* because the officers deceitfully designed to re-

move him from his house. The court disagreed, however, concluding that "the subterfuge allegedly used [did] not violate fundamental fairness and [did] not illegally circumvent the rule announced in *Payton.*" *Moore*, 105 Ill. App. 3d at 269, 434 N.E.2d at 304.

 █ Arias argues that *Moore* is distinguishable because the defendant in that case was arrested outside of his home. However, where the defendant alleges that his arrest was effected through deceitful conduct, the fairness of the arrest does not turn on whether it occurred inside or outside of his home. (See *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608.) In *Bean*, police officers with probable cause, without a warrant and without exigent circumstances knocked on the door of the defendant's home. The defendant's mother answered, and the officers identified themselves and told her that they wanted to see the defendant. After the mother invited them inside, the officers proceeded to arrest the defendant. Notwithstanding the fact that the officers indicated their intention merely "to see" the defendant while they actually intended to arrest him, the supreme court of Illinois concluded that the defendant's mother voluntarily invited the officers into the apartment and that the arrest was, therefore, valid. (*Bean*, 84 Ill. 2d at 70, 417 N.E.2d at 611.) In this case, the officers' actions were little different from those of the officers in *Bean*. After identifying themselves to Mario and indicating that they wanted to question the defendant, Mario invited the officers into the house. No one else in the house objected to the presence of the officers. Under these circumstances, we conclude that Mario's inviting the police to enter the apartment was voluntary and did not affect the legality of the defendant's subsequent arrest.

 As a final matter, we note that while he did not urge the argument on appeal, the defendant asserted in his motion to suppress that his confession should be suppressed solely because the officers violated section 3—2 of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2) in refusing to honor the defendant's request to contact his father. In support of his argument, he cited to *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654, and *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *appeal denied* (1987), 116 Ill. 2d 570, 515 N.E.2d 120. Neither case, however, stands for the argued proposition. Rather, the courts in both cases observed that violation of section 3—2 of the Juvenile Court Act is only one factor in determining whether a minor defendant's confession is voluntary. (*Travis*, 122 Ill. App. 3d at 677, 462 N.E.2d at 656; *McGhee*, 154 Ill. App. 3d at 236-37, 507 N.E.2d at 35.) While both courts concluded that the minors in their respective cases gave inculpatory

statements involuntarily, we note that a significant factor contributing to the "totality of the circumstances" in both cases was the fact that the minors in both cases were arrested and detained without probable cause in violation of their rights as defined by the Supreme Court of the United States in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. (*Travis*, 122 Ill. App. 3d at 675-77, 462 N.E.2d 657-58; *McGhee*, 154 Ill. App. 3d at 237, 507 N.E.2d at 38.) No such factor exists here. In fact, the defendant concedes that the officers had probable cause to arrest Arias.

■ Moreover, considering the "totality of the circumstances" here, we conclude that Arias' inculpatory statements were not given involuntarily. He testified that he fully understood the *Miranda* warnings which were explained to him prior to his giving the statements. He testified that he was not under the influence of drugs or alcohol at the time of his arrest and interview. He testified that he was not beaten, struck, threatened or promised anything before he gave the statements and that he was not influenced by any type of duress. He was given juice and permitted to use the restroom. Though his parents were not immediately contacted upon the defendant's arrival at the station, the defendant's mother, elder brother and girlfriend all knew that he had been taken to the police station, and his mother and brother knew that there was a phone number on the card which had been handed to them by the officers. Moreover, though the defendant indicated that he wanted to call his father, he testified that he only wanted to inform his father of his arrest, and he further testified that his giving the statements was not influenced by his inability to contact his father. Therefore, though the police erred in not immediately attempting to notify the defendant's parents of his arrest, their failure did not, in view of all of the surrounding circumstances, render the defendant's statement involuntary.

For these reasons we conclude that the trial court erred in quashing the defendant's arrest and suppressing his inculpatory statements. We accordingly reverse its judgment and remand the cause for proceedings consistent with this opinion.

Reversed and remanded.

BARRY and HEIPLE, JJ., concur.