[No. 59755-3.   En Banc.   November 4, 1993.]

THE STATE OF WASHINGTON, *Petitioner*, v. SCOTT CARL SOLBERG, *Respondent*.

*Norm Maleng, Prosecuting Attorney, Theresa Fricke, Senior Prosecuting Attorney,* and *Brenda Louise Bannon, Deputy,* for petitioner.

*Steinborn & Associates,* by *Kenneth R. Friedman, Jeffrey Steinborn,* and *Andrew L. Subin,* for respondent.

*Christine O. Gregoire, Attorney General,* and *John R. Wasberg, Assistant,* amicus curiae for petitioner.

ANDERSEN, C.J. —

FACTS OF CASE

This case involves first, the legality of an arrest which occurred on the front porch of a suspect's home and second, a challenge to the Court of Appeals decision vacating the exceptional sentence imposed by the trial court in this case.

On April 27, 1989, a woman, who identified herself only as a real estate agent, called police and informed them that she had smelled a strong odor of marijuana at a home she had been attempting to show to a prospective buyer. Pursuant to that tip, two police officers went to the address the following day. The police asked and received permission from the neighbors to go onto their property in order to observe the home described by the caller. Both officers smelled a strong odor of marijuana near the house, observed that the basement windows had been covered and that there was mildew and peeling paint on the side of the house. The officers later explained that, in their experience, due to the inside humidity, mildew and peeling paint are common on the exterior of houses that contain marijuana grow operations.

Based on these observations, the officers executed an affidavit to Seattle City Light to obtain the power consumption records for the residence.[1] An official at City Light, who had previously taught one of the officers a class on power con-

---

[1] RCW 42.17.314; *State v. Maxwell,* 114 Wn.2d 761, 791 P.2d 223 (1990).

sumption as related to indoor grow lights, informed the officers that the power consumption was excessive for the size of the home and for the time of year and that such consumption was consistent with the operation of four or five halide grow lights. The officers determined from the police computer and from the City Light records that the occupant of the house was Scott C. Solberg. This was consistent with the neighbors' earlier statement that "Sol" lived at the address under investigation.

The officers then returned to the residence in order to obtain an exact description of the property for the application for a search warrant. When they arrived at the property, there was a van beside the house which had not been present on their earlier visit. The officers determined from the license plate number that the vehicle was registered to Scott Solberg. One of the officers stated that it was common to talk to suspects before obtaining a search warrant. The other officer explained that because they had earlier identified themselves to the neighbors as police officers, they were concerned that the grow operation they suspected was in the house might be dismantled before they could obtain the search warrant. They decided to make contact with the residents.

The officers knocked on the door and Mr. Solberg's roommate, Edward Bowley, answered and stepped out onto the porch. One of the officers explained to Mr. Bowley that they were investigating a possible grow operation in the house. Mr. Solberg testified that he overheard the officers talking to Mr. Bowley and so he "went to the front door and went out and talked to the officers." Mr. Solberg testified that the conversation with the officers took place out on the porch. The fact that the entire conversation between Mr. Solberg and the two arresting officers occurred on the unenclosed front porch was corroborated by the police officers' testimony.

After Mr. Solberg joined Mr. Bowley and the two officers on the porch, one of the officers read both suspects their

*Miranda*[2] rights. The other officer then told the suspects that the officers believed there was a grow farm in the basement, why they had that belief, and that based on power consumption they suspected there were four or five halide grow lights in the basement. Mr. Solberg replied that there were only four lights.

Other officers were called to the house to wait with Mr. Solberg and Mr. Bowley while the first two officers went to write the warrant affidavit and secure the search warrant. During the 2 to 3 hours it took to secure the search warrant, Mr. Solberg and Mr. Bowley were not allowed to leave the premises. Although there was conflicting testimony at the suppression hearing, the trial court found that the officers remained outside of the house prior to serving the warrant. No error has been assigned to this finding.

The affidavit in support of the search warrant contained the information about the anonymous tip, the strong odor of marijuana near the house as noticed by officers familiar with the smell, the blacked-out windows, the mildew accumulation on the basement exterior, the information obtained from the City Light power consumption records, and the statement given to the officers by Mr. Solberg on the front porch that the house contained four grow lamps and that money was tight and he needed to supplement his income. Pursuant to the affidavit, the search warrant was issued.

After the search revealed evidence of a marijuana grow operation in the basement, Mr. Solberg was charged under RCW 69.50.401(a) with possession of a controlled substance, marijuana, with intent to manufacture or deliver.

Mr. Solberg moved to suppress the evidence on the basis that he was unlawfully arrested, that his residence was unlawfully seized, and that the search warrant was not based on probable cause. The trial court found that there was probable cause to arrest and that Mr. Solberg was therefore lawfully arrested. It further found that the defendant

[2]*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

was read his *Miranda* rights prior to making a knowing and voluntary statement and that there was no search of the home until the search warrant was served. The trial court also found that the search warrant was supported by probable cause. The trial court, therefore, declined to suppress the evidence found in defendant's residence. Mr. Solberg waived his right to a jury trial and was found guilty by the court.

The trial court imposed an exceptional sentence of 6 months and 12 months in community supervision. Mr. Solberg appealed both his conviction and his sentence to the Court of Appeals.

The Court of Appeals held that Mr. Solberg was illegally arrested on his porch. *State v. Solberg*, 66 Wn. App. 66, 79, 831 P.2d 754 (1992), *review granted*, 120 Wn.2d 1019 (1993). However, because the affidavit for the search warrant contained sufficient facts to establish probable cause to search even without the statement Mr. Solberg made following his arrest, the Court of Appeals declined to suppress the evidence found pursuant to the warrant. It then affirmed Mr. Solberg's conviction. The Court of Appeals also held that the seizure of the house for the amount of time it took officers to obtain the search warrant was a lawful seizure, and that the search warrant affidavit contained sufficient facts to establish probable cause independent of Mr. Solberg's statement "following his unlawful arrest".[3]

The Court of Appeals then reversed the trial court's imposition of an exceptional sentence and remanded for resentencing within the standard range.

The State petitioned for review only of the Court of Appeals conclusion that defendant was illegally arrested and of that part of the Court of Appeals decision reversing the exceptional sentence imposed by the trial court. We accepted review. Although the lawfulness of the arrest was irrelevant to the ultimate determination of the validity of the defendant's convic-

---

[3]*State v. Solberg*, 66 Wn. App. 66, 79, 831 P.2d 754 (1992), *review granted*, 120 Wn.2d 1019 (1993).

tion as analyzed by the Court of Appeals, we have determined it is nonetheless an important issue for this court to resolve. Research indicates that warrantless arrests which occur on porches and which are supported by probable cause are quite common. Amicus, the State of Washington Attorney General, argues that prior to this published Court of Appeals holding, Washington law was settled that the threshold of the home was the "bright line" over which police could not cross absent a warrant, consent, or exigent circumstances. Mr. Solberg does not ask this court to review the part of the Court of Appeals decision affirming his conviction but does claim that the State's petition is untimely as to the arrest issue. He also argues that the Court of Appeals was correct in vacating the trial court's imposition of the exceptional sentence.

Three issues are here presented.

## ISSUES

ISSUE ONE. Is the State's petition for review of the arrest issue timely?

ISSUE TWO. May the police make a warrantless arrest of a suspect, based upon probable cause, when the suspect voluntarily exits a residence to speak to officers on the front porch of the home?

ISSUE THREE. Did the Court of Appeals err in vacating the trial court's imposition of an exceptional sentence?

## DECISION

ISSUE ONE.

CONCLUSION. The State's petition for review of the arrest issue is timely under our Rules of Appellate Procedure.

The Court of Appeals decision in this case was filed on June 15, 1992, and the State made a timely motion for reconsideration on July 2, 1992, raising the issues of the legality of the arrest and the vacation of the exceptional sentence. On July 15, 1992, the Court of Appeals entered an order denying the State's motion for reconsideration as to the arrest issue, but requested that the appellant (Mr. Solberg) file an answer to the motion for reconsideration with regard to the exceptional sentence issue. On August 27, 1992 the Court of Appeals

entered an order denying the motion for reconsideration, and sent a letter to counsel stating that within 30 days after that order was filed, the opinion of the Court of Appeals would become final unless a petition for review was filed in accordance with RAP 13.4. The State then filed its petition for review raising both issues on September 25, 1992.

■ Mr. Solberg claims that the petition is only timely as to the sentencing issue and that the State should have filed a separate petition for review on the arrest issue within 30 days of the Court of Appeals order denying reconsideration of the arrest issue and calling for an answer on the sentencing issue. Mr. Solberg is incorrect. Under RAP 13.4(a), a party who seeks reconsideration of all or any part of a Court of Appeals decision must file a petition for review within 30 days of the date reconsideration is denied. Petitions for review are filed from "decision[s] terminating review". RAP 13.3(b); RAP 13.4(a). The July 15, 1992 order only denied reconsideration of one issue and called for an answer on the other issue; it was not an order "terminating review". The order which terminated review in the Court of Appeals was filed on August 27 and therefore the petition for review, filed within 30 days of that date, was timely. RAP 13.4(a).

ISSUE TWO.

CONCLUSION. Police may make a warrantless arrest of a suspect, if it is based upon probable cause, when the suspect voluntarily exits his or her residence to speak to officers on an unenclosed front porch of a home.

A police officer may make a warrantless felony arrest in a public place so long as it is supported by probable cause.[4] An arrest warrant is not required in such circumstances under either the federal or state constitutions.[5] However, in the absence of exigent circumstances, police may not make a warrantless arrest after a nonconsensual entry into a sus-

---

[4]*United States v. Watson*, 423 U.S. 411, 423, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976).

[5]*See, e.g., State v. Ramirez*, 49 Wn. App. 814, 824, 746 P.2d 344 (1987); Utter, *Survey of Washington Search and Seizure Law: 1988 Update*, 11 U. Puget Sound L. Rev. 411, 506 (1987-1988).

pect's home. *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980).[6] In *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976), the Court had previously held that a suspect standing on the threshold of the home could be arrested by officers arriving at the home. Courts have had some difficulty in reconciling *Santana* with *Payton* and have split on the issue whether a suspect standing in the open doorway of a home can be arrested based on probable cause without a warrant.

In Washington, absent exigent circumstances, the police are prohibited from arresting a suspect while he or she is standing within the doorway of the residence.[7] *State v. Holeman*, 103 Wn.2d 426, 429, 693 P.2d 89 (1985). As the *Holeman* court, quoting *Payton*, explains,

> [t]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Holeman*, 103 Wn.2d at 429.

The *Holeman* court reasoned that it was the location of the arrestee and not the location of the arresting officer that was determinative. In *Holeman*, the police officer had reached inside the suspect's home to grab the suspect and there was no consent to enter. The Court of Appeals in the present case relied on *Holeman* for its ultimate conclusion that Mr. Solberg was arrested "in his home". *Solberg*, 66 Wn. App. at 71-72. The Court of Appeals reasoned that since a suspect cannot be arrested on the threshold of his home when he or she answers the door to police, an arrest cannot be made on the porch if the suspect steps out of the house onto the porch to

---

[6] *See also State v. Counts*, 99 Wn.2d 54, 659 P.2d 1087 (1983).

[7] While the difference between Const. art. 1, § 7 and the Fourth Amendment may permit the freedom from unreasonable searches and seizures to be interpreted more expansively under the state constitution, no one in the present case has undertaken a consideration of the factors set forth in *State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986), as they may apply in this particular case. Hence, independent review is considered only to the extent existing case law indicates greater protections are afforded under Washington law.

speak with officers. The Court of Appeals' extension of the *Holeman* rule is largely unsupported by authority.

Although we recognize that the *Holeman* opinion has been criticized[8] and may be a minority position, it is nonetheless settled law in Washington and draws a bright line at the threshold of the home. The *Holeman* conclusion is not without support in other jurisdictions.[9] In any event, this case does not present the *Holeman* factual issue; the issue in this case is not whether an arrest is valid when a suspect answers the door to the residence and remains *in the home* while the police attempt to make a warrantless arrest. Here, the evidence shows that Mr. Solberg overheard Bowley talking to police out on the porch and joined them there of his own volition. The Court of Appeals' reliance on *Holeman* is misplaced as the precise issue here is whether there is a reasonable expectation of privacy on a porch thus bringing such an area within the scope of the *Payton* rule, or whether such an area is a public area for arrest purposes so as to fall under the rule announced in *United States v. Watson*, 423 U.S. 411, 423, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976), that warrantless arrests in public are legal. The Court of Appeals decision largely ignores the body of law which considers the issue of warrantless arrests made on a suspect's porch.

█ The conclusion that a warrantless arrest on a porch made after a resident has voluntarily exited the home is an illegal arrest, even if supported by probable cause, conflicts

---

[8]2 W. LaFave, *Search and Seizure* § 6.1(e), at 589-91 (2d ed. 1987). *See also* *United States v. Berkowitz*, 927 F.2d 1376, 1385-86 (7th Cir.) (noting that the chief evil against which the Fourth Amendment is directed is the physical entry of the home and that courts have generally upheld warrantless arrests when a resident answers a police knock on the door and the suspect acquiesces to the arrest), *cert. denied*, ___ U.S. ___, 116 L. Ed. 2d 108, 112 S. Ct. 141 (1991).

[9]*See Smith v. State*, 72 Md. App. 450, 466-67, 531 A.2d 302 (1987) (recognizing the difficulty reconciling *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976) and *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) and discussing cases on both sides of the threshold-arrest issue), *cert. granted*, 311 Md. 698 (1988); *United States v. Bradley*, 922 F.2d 1290 (6th Cir. 1991).

with other Washington decisions, with authority from other jurisdictions, and with scholarly comment.

In *State v. Carlow*, 44 Wn. App. 821, 826, 723 P.2d 522 (1986), the defendant relied on *Payton* in arguing that he was unlawfully arrested. The Court of Appeals there held that because he stepped out onto the porch after the officer knocked at his door that he was arrested outside the house; it therefore affirmed his conviction. Division One held in *State v. Bockman*, 37 Wn. App. 474, 481, 682 P.2d 925, *review denied*, 102 Wn.2d 1002 (1984), that the front porch of the home is a public place for arrest purposes where, once probable cause is established, the officers may properly make an arrest. In *State v. Griffith*, 61 Wn. App. 35, 40 n.2, 808 P.2d 1171, *review denied*, 117 Wn.2d 1009 (1991), Division Three, citing *Holeman, Bockman* and *Payton*, recognized that although a suspect is considered to be in the home for purposes of the Fourth Amendment if standing in the doorway, that the front porch of a home is considered a public place for arrest purposes.[10] The privacy of the home is the fundamental rationale supporting the *Payton* and the *Holeman* rule.[11] Therefore, the degree of privacy afforded to an unenclosed front porch is the relevant issue here. In *State v. Myers*, 117 Wn.2d 332, 344, 815 P.2d 761 (1991), this court reiterated the rule that a police officer who approaches a residence in connection with an investigation, from a common access route, does not violate the resident's reasonable expectation of privacy and that a front porch is not a constitutionally protected area.

Many courts in other states have considered the question whether police can arrest a suspect on the front porch of his or her home without violating the *Payton* rule. In *Waldrop v. State*, 462 So. 2d 1021 (Ala. Crim. App. 1984), *cert. denied*, 472

---

[10]*See also Ramirez*, 49 Wn. App. at 821 (noting that the "bright line" is at the home's threshold); *State v. Seagull*, 26 Wn. App. 58, 64, 613 P.2d 528 (1980), *aff'd*, 95 Wn.2d 898, 632 P.2d 44 (1981); *State v. Ferro*, 64 Wn. App. 181, 183, 824 P.2d 500, *review denied*, 119 Wn.2d 1005 (1992).

[11]*Payton*, 445 U.S. at 589.

U.S. 1019 (1985), the Alabama Court of Criminal Appeals reasoned that since there was nothing in the police officers' conduct to suggest any element of coercion and since the defendant willingly came out of the house and onto the front porch, the *Payton* rule protecting against warrantless entry into the home did not apply. The *Waldrop* court stated that although the porch of a house may be characterized as private under the law of property, it is not usually a place where a person has a reasonable expectation of privacy. The court concluded that the protections afforded in *Payton* clearly do not apply outside the physical boundaries of the home as the theoretical basis of the *Payton* decision is that an arrest within a home violates the sanctity of the home whereas outside the boundaries of the home, no such violation is present. We agree and note that this position accords with the overwhelming weight of authority on this issue.[12]

Scholarly comment is in accord with the authorities which hold that a porch is not a constitutionally protected area for purposes of arrest. Justice Utter has noted that while the arrest of a suspect who is standing in the doorway of his or her home is treated the same as an arrest in the home (because for Fourth Amendment purposes the location of the suspect, and not the officer, is material to the issue of whether an arrest occurs in the home), an arrest of a suspect who is located on a front porch is considered a "public arrest". Utter, *Survey of Washington Search and Seizure Law: 1988 Update*, 11 U. Puget Sound L. Rev. 411, 507-08 (1987-1988).

---

[12]*State v. Santiago*, 224 Conn. 494, 619 A.2d 1132 (1993); *Koehler v. State*, 444 So. 2d 1032 (Fla. Dist. Ct. App. 1984); *Keyser v. State*, 187 Ga. App. 95, 369 S.E.2d 309, *cert. denied*, 187 Ga. App. 908 (1988); *People v. Lekas*, 155 Ill. App. 3d 391, 508 N.E.2d 221, *appeal denied*, 116 Ill. 2d 569 (1987), *cert. denied*, 485 U.S. 942 (1988); *People v. Arias*, 179 Ill. App. 3d 890, 535 N.E.2d 89, *appeal denied*, 126 Ill. 2d 561 (1989); *People v. Jones*, 119 Ill. App. 3d 615, 456 N.E.2d 926 (1983); *People v. Herner*, 156 Misc. 2d 735, 594 N.Y.S.2d 544 (Sup. Ct. 1993). Our research discloses just one case which affords the same degree of privacy to an unenclosed front porch as to a home and concluded that an arrest on a porch violates *Payton*. That is *Shrader v. State*, 13 Ark. App. 17, 678 S.W.2d 777 (1984). *Shrader*, however, relies on a case in which the resident had been ordered at gunpoint to come outside; *Shrader* has not been cited as authority outside of Arkansas.

Professor LaFave discusses cases involving arrests made on the premises outside rather than inside the threshold of the home. He explains that

> courts have upheld warrantless arrests made in such places as the common hallway of an apartment building, or the yard or porch of a house. . . . Though some of the cases on outside-the-threshold arrests have not even considered how it was that the defendant came to be there rather than inside, others have given specific attention to the police action which caused the arrested person first to leave the interior of the residence. It has been deemed unobjectionable that the defendant came outside at the request of police who did not reveal their intention to arrest, or, indeed, even that the police engaged in some affirmative misrepresentation, such as that they merely wanted to discuss matters with him or that he was viewed by them only as a suspect or a witness. Such ruses have been considered permissible because . . . "in other contexts, courts have considered the police tactic of misinformation and have found no constitutional violation." Here again, however, the warrantless arrest will be illegal if the defendant's presence outside was acquired by coercion or a false claim of authority (e.g., that otherwise they would be entitled to enter the premises).

(Footnotes omitted.) 2 W. LaFave, *Search and Seizure* § 6.1(e), at 593-94 (2d ed. 1987).

Since there is no evidence of coercion by the officers and based on the foregoing authorities, we conclude that the arrest on the porch was valid based on probable cause and that a warrant was not constitutionally required under either the *Payton* or *Holeman* doctrines.[13]

ISSUE THREE.

CONCLUSION. There is specific statutory authority for imposition of an exceptional sentence in this case; the Court of Appeals therefore erred in vacating the trial court's imposition of an exceptional sentence.

Mr. Solberg was found guilty of possessing marijuana with intent to deliver in violation of RCW 69.50.401(a). The standard range was 1 to 3 months with a maximum term of 5 years; the trial court imposed a 6-month sentence. The Court

---

[13]There is no challenge to the Court of Appeals decision upholding the trial court's determination that the arrest was supported by probable cause.

of Appeals vacated the exceptional sentence and remanded for imposition of a sentence within the standard range. The State argues that the Court of Appeals erred in vacating the exceptional sentence. We agree.

The trial court made the following findings and conclusions in support of the exceptional sentence:

### I. FINDINGS OF FACT

1. This grow operation involved 496 marijuana plants: 311 were mature plants, 185 were starter plants.

2. This offense involved a high degree of sophistication in terms of time and effort and a substantial financial investment for the equipment and power necessary for the operation.

3. The estimated market value of the plants being grown is between $15,000-$400,000.

4. There was evidence of the defendant's involvement in retail or wholesale sales of marijuana to supplement his income.

### II. CONCLUSIONS OF LAW

This growing operation clearly evidenced production for use by others, or for "other than personal use," and for sale at either a wholesale or retail level.

Based on the facts set out under section 1 this court finds there are substantial and compelling reasons for departing from the presumptive range.

The court imposes 6 months.

RCW 9.94A.390(2)(d) provides that an exceptional sentence above the standard range may be imposed for drug related crimes if:

The current offense was a major violation of the Uniform Controlled Substances Act, chapter 69.50 RCW (VUCSA), related to trafficking in controlled substances, which was more onerous than the typical offense of its statutory definition: *The presence of ANY of the following may identify a current offense as a major VUCSA:*

. . . .

(iii) The current offense involved the manufacture of controlled substances for use by other parties; or

. . .

(v) The current offense involved a high degree of sophistication or planning or occurred over a lengthy period of time or involved a broad geographic area of disbursement; . . .

(Italics ours.)

In the present case the Court of Appeals reviewed the sentence under a "matter of law" standard of review and con-

cluded "nothing in the record establishes that this grow operation is more sophisticated or larger than the average indoor grow operation."[14] The court quoted from *State v. Shupe,* 55 Wn. App. 588, 590, 779 P.2d 270 (1989) that " '[w]hen appellant's operation is compared with those described in numerous Washington cases, [appellant's] operation appears rather typical.' " In *Shupe,* the court had compared the defendant's marijuana grow operation to the marijuana farms in eight other published appellate decisions in order to conclude that the present "growing operation" was typical of *other indoor growing operations.*

■ This is not the proper inquiry. For purposes of imposing an exceptional sentence, the statute states that an offense is a major violation of the Uniform Controlled Substances Act when it is more onerous than the *"typical offense of its statutory definition".* (Italics ours.) RCW 9.94A.390(2)(d). The statutory definition of the crime charged here includes all cases involving the possession of marijuana with intent to manufacture or deliver, not just those which involve large marijuana grow operations manufactured for the purpose of sale to others. For example, one may be convicted of violating RCW 69.50.401(a) for manufacturing marijuana even if one is growing marijuana only for personal use.[15] Comparing the circumstances of a violation of the statute prohibiting the possession of marijuana with intent to manufacture or deliver to grow operations which are described in other appellate decisions skews the inquiry. Comparing the facts of the current drug crime with prior crimes described in published appellate decisions would likely result in comparing the crime to the most egregious examples of violations of the statute because most minor cases are resolved by plea bargaining, at the trial court level, or in unpublished appellate decisions.

---

[14]*State v. Solberg,* 66 Wn. App. 66, 81, 831 P.2d 754 (1992), *review granted,* 120 Wn.2d 1019 (1993).

[15]*State v. Adams,* 46 Wn. App. 874, 733 P.2d 989, *review denied,* 108 Wn.2d 1012 (1987). *State v. Taatjes,* 43 Wn. App. 109, 113, 715 P.2d 1153, *review denied,* 105 Wn.2d 1020 (1986).

In addition, even if a "proportionality" review based on prior published appellate decisions were a correct inquiry, which it is not, the cases cited to, and compared, in the *Shupe* case (and in the Court of Appeals decision in this case) do not provide useful comparisons. In *Shupe*, and in the Court of Appeals decision here, the courts conclude, on the basis of eight prior appellate decisions, that this case does not deserve an exceptional sentence because it looks similar to the facts in those cases.[16] One problem with this approach is that none of the cited cases involved a sentencing issue. In fact, in none of those cases did the appellate court decisions so much as describe what sentence was imposed. So far as the published opinions show, sentences outside what is now the standard range may have been imposed in any or all of them.

If we agreed with the Court of Appeals that a comparison of prior published cases is the correct inquiry, then presumably each trial court (and each appellate court) would have to compare the universe of appellate court drug cases to determine if the exceptional sentence was "proportionate". Clearly the Legislature did not intend for the trial courts, or the appellate courts, to engage in a proportionality review of all prior drug sentences. Rather, the Legislature set out a set of nonexclusive criteria and committed the sentencing decision to the guided discretion of the trial courts. In fact, the statute is quite clear that a finding of any one of the listed aggravating circumstances will support a trial court's imposition of an exceptional sentence.

■ Since we conclude that the comparison to other appellate cases was not the proper way to determine whether an exceptional sentence should be reversed, the issue becomes whether this exceptional sentence should have been vacated. Only substantial and compelling factors other than those necessarily considered by the Legislature in computing the presumptive range of the offense will justify an exceptional

---

[16]*Solberg*, 66 Wn. App. at 81; *State v. Shupe*, 55 Wn. App. 588, 590 n.3, 779 P.2d 270 (1989).

sentence.[17] An appellate court must review an exceptional sentence according to RCW 9.94A.210(4), which provides:

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

■ Whether the reasons are supported by evidence in the record is reviewed under the "clearly erroneous" standard of review. Whether the reasons justify a departure from the standard range is reviewed as a "matter of law". Whether the sentence is clearly excessive is reviewed under the "abuse of discretion" standard. *State v. Batista*, 116 Wn.2d 777, 792, 808 P.2d 1141 (1991); *State v. Dunaway*, 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987).

In this case, the record supports the trial court's factual findings.[18] The search of the basement of the house revealed 316 mature marijuana plants, 180 starter plants, 473 grams of cut marijuana, four halide lights, six power transformers, five electrical timers, an irrigation hose sprayer, a temperature gauge, plastic baggies, a triple beam scale, a charcoal filtered blower, and a fan. This supports the trial court's factual findings regarding the amount of marijuana found and the high degree of sophistication in terms of time, effort and financial investment. A police narcotics specialist's testimony regarding the value of the drugs found in the defendant's basement supports the trial court's finding that the market value of the plants was between $15,000 and $400,000, although the testimony could have supported a finding that

---

[17]*State v. Mejia*, 111 Wn.2d 892, 902, 766 P.2d 454 (1989).

[18]In the briefing to this court, the defendant argues that *based on statistics* in the state regarding exceptional sentences, this court should uphold the Court of Appeals' vacation of the exceptional sentence. However, the review by an appellate court of an exceptional sentence is to be made "solely upon the record that was before the sentencing court." RCW 9.94A.210(5). It is not clear how sentencing statistics are relevant in any event as the statute describes the proper method of appellate review.

the 496 plants had an even a higher total value. There also was evidence that Solberg told one of the officers that he grew the plants to sell them to pay his bills and that he had been growing the marijuana for money for approximately 1½ years and that he did not use it himself. This evidence supports the finding that the defendant was involved in the retail or wholesale sales of the drug to supplement his income. We conclude that the trial court's reasons for imposing an exceptional sentence are supported by the record and are by no means "clearly erroneous".

The next inquiry then is whether the reasons, as a matter of law, justify a sentence outside the standard range. The Court of Appeals decision assumes that the trial court based its decision to impose an exceptional sentence only on RCW 9.94A.390(2)(d)(v) which involves drug violations that have a high degree of sophistication.[19] However, the trial court's written legal conclusion was also based upon RCW 9.94A-.390(2)(d)(iii) which provides that it is a major violation of the Uniform Controlled Substances Act when "[t]he current offense involved the manufacture of controlled substances for use by other parties". The statute indicates that "ANY" of the circumstances in the list of aggravating circumstances may "identify" an offense as a major violation of the Uniform Controlled Substances Act which may justify the imposition of a sentence beyond the standard range.[20]

Professor David Boerner, in his treatise on Washington's sentencing law, points out that in 1983 when the State Sentencing Guidelines Commission recommended treating a major violation of the Uniform Controlled Substances Act as an aggravating circumstance, it, with one exception, used language essentially identical to the comparable Minnesota provision. The one change was to replace the Minnesota requirement that *at least two* of the specified circumstances exist with "the emphatic statement that the presence of

---

[19]*Solberg*, 66 Wn. App. at 81.

[20]RCW 9.94A.390(2)(d).

'ANY' of the specified circumstances was a sufficient aggravating circumstance".[21] Therefore, a properly supported finding of any one of the statutory aggravating circumstances may elevate a drug offense to a "major violation" which allows a trial court, in its discretion, to impose an exceptional sentence. Since the 496 plants were admittedly manufactured for sale, the exceptional sentence should have been upheld on appeal.[22]

■ ■ A second legal justification for the exceptional sentence is found in RCW 9.94A.390(2)(d)(v) which provides that an offense is a "major offense" when it involves a high degree of sophistication or planning or occurred over a lengthy period of time or involved a broad geographic area of disbursement. For "sophistication" to constitute justification for an exceptional sentence, it must be of a kind not usually associated with the commission of the offenses in question.[23] The amount of drugs which was possessed for sale, together with the amount and sophistication of the equipment used, and the length of time this grow farm existed is sufficient to support a finding that this was a more sophisticated operation than the usual crime involving possession of marijuana with intent to deliver or manufacture. Trial courts, having more familiarity with day-to-day drug violations, are in the best position to identify drug violations which are more sophisticated than "usual". In addition, this statutory aggravating circumstance is phrased in the disjunctive and, hence, a high degree of planning or a lengthy period of time each independently supports an exceptional sentence.

■ Several cases have held that the size of a drug deal alone is sufficient to identify an offense as a major viola-

---

[21]D. Boerner, *Sentencing in Washington* § 9.13(d), at 9-42 (1985).

[22]*See State v. Vogel*, 385 N.W.2d 35, 37 (Minn. Ct. App. 1986) (guidelines to determine a major drug offense require the finding of two of the statutory circumstances; the presence of two renders a major controlled substance offense "more onerous than the usual offense.").

[23]*State v. Dunaway*, 109 Wn.2d 207, 219, 743 P.2d 1237, 749 P.2d 160 (1987).

tion.[24] In this case there were close to 500 plants. A narcotics officer testified that a "very large" marijuana grow operation would usually involve four to eight grow lights. The operation here involved four grow lights. We conclude that the trial court's findings and conclusions were clearly sufficient to show this was a major violation of the Uniform Controlled Substances Act.

■ With regard to the third issue on appellate review of exceptional sentences, there is no allegation that the sentence is "clearly excessive" and, in any event, only if the trial court's action was one that no reasonable person would have taken will an appellate court reverse on this ground.[25]

The Court of Appeals decision vacating the exceptional sentence is reversed and the trial court's sentence is reinstated.

BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

MADSEN, J. (dissenting) — Under the Sentencing Reform Act of 1981 (SRA), a trial judge may sentence a defendant in excess of the standard range when "[t]he current offense was a major violation of the Uniform Controlled Substances Act . . . *which was more onerous than the typical offense of its statutory definition* . . .". (Italics mine.) RCW 9.94A.390(2)(d). The majority's result ignores this highlighted language and instead affirms an exceptional sentence solely on the showing of a major violation of the Uniform Controlled Substances Act. Because the statute requires an additional showing that the current offense be more onerous than the typical offense of its statutory category, and no such finding or conclusion was made by the sentencing judge below, I dissent.

---

[24]*State v. Gunther*, 45 Wn. App. 755, 760, 727 P.2d 258 (1986), *review denied*, 108 Wn.2d 1013 (1987); *Mejia*, 111 Wn.2d at 902; *State v. Stalker*, 42 Wn. App. 1, 4, 707 P.2d 1371 (1985), *review denied*, 107 Wn.2d 1018 (1986).

[25]*State v. Armstrong*, 106 Wn.2d 547, 552, 723 P.2d 1111 (1986).

In subsection (2)(d) the Legislature specified that finding any one of the factors listed in RCW 9.94A.390(2)(d)(i)-(iv) will establish a major drug violation. Clearly absent from the statute is language that finding a major violation, by itself, will justify an exceptional sentence. Instead, the Legislature deliberately added a further condition precedent: that the violation be more onerous than the typical crime in its statutory definition.

I do not dispute the majority's conclusion that the findings of the trial court support a conclusion that the violation in this case constituted a major drug violation. The majority, however, then holds that finding a major drug violation ends the inquiry. This holding reads the requirement of finding "onerousness" out of the statute in violation of this court's duty to give effect to all provisions in a statute. *See Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 529-30, 844 P.2d 389 (1993); *In re Robles*, 63 Wn. App. 208, 216, 817 P.2d 419 (1991). I would instead give effect to all the relevant statutory language by requiring that a major drug offense be more onerous than the typical case of its category before it can be used in justifying an upward departure from the standard sentence range.

While I do not necessarily support a proportionality review based on published appellate cases as proposed by the Court of Appeals, I believe this approach is nevertheless on the right track. The Legislature has included a requirement of onerousness without either defining the term or providing any examples. In the absence of legislative guidance, the Court of Appeals approach provides a standard against which a trial judge may measure the onerousness of the violation. Some standard is essential to avoid the arbitrary imposition of penalties and to provide criteria for appellate review. *See State v. Shove*, 113 Wn.2d 83, 88-89, 776 P.2d 132 (1989).

The majority opinion criticizes a proportionality approach for essentially two reasons. First, the majority hypothesizes that the less serious cases will be resolved through plea bargaining, thus skewing the pool of appellate cases. I reject

this surmise because the reality of criminal practice is quite the opposite. More often a serious case will result in a negotiated plea because of the risks attendant in sentencing. In a typical case, the defendant takes a far smaller risk by going to trial since there is less to be gained by negotiating a sentence recommendation.

Second, the majority states that RCW 9.94A.390(2)(d) does not require a proportionality review because "Clearly the Legislature did not intend for the trial courts, or the appellate courts, to engage in a proportionality review . . .". Majority, at 704. This position is contrary to the plain language of subsection (2)(d) and the stated legislative "purposes" underlying the SRA. In enacting RCW 9.94A.010, the Legislature expressed an intent to:

> (1) Ensure that the punishment for a criminal offense is *proportionate* to the seriousness of the offense and the offender's criminal history;
> (2) Promote respect for the law by providing punishment which is just;
> (3) Be *commensurate* with the punishment imposed on others committing similar offenses;

(Italics mine.) RCW 9.94A.010.

While rejecting the Court of Appeals' approach to proportionality review, the majority seems to suggest that even if such a review is contemplated under subsection (2)(d), the correct approach is to allow each sentencing judge to imagine the various permutations on the commission of crimes in a given category and then decide which manner of violation is more onerous than another, thus deserving of greater penalty. This, it seems to me, is squarely the responsibility of the Legislature. It is to that branch of government that responsibility for designating crime categories and penalties was assigned. *See Seattle v. Buchanan*, 90 Wn.2d 584, 605, 584 P.2d 918 (1978) ("the power to define criminal offenses resides in the legislative branch"); *State v. Ammons*, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 ("the fixing of legal punishments for criminal offenses is a legislative function"), *cert. denied*, 479 U.S. 930 (1986). On the other hand, it is the role of judges to consider individual defendants and to

sentence proportionate to the seriousness of the offense and commensurate with the punishment imposed on others committing similar offenses. RCW 9.94A.010.

Since the Legislature requires a finding of "onerousness" to justify an increased penalty, some form of proportionality review is necessary to avoid an arbitrary decision. Absent an objective standard, a finding of onerousness will be based on the experience and imagination of the judge, standards in the community, case workloads, and the predilection of elected prosecutors. It is interesting to contrast this result with the manner in which sentencing was carried out before the SRA was adopted. At that time, a certain degree of uniform sentencing was achieved because the actual time served on most sentences was decided by a single entity, the Indeterminate Sentence Review Board. Thus, in certain respects, the majority's holding allows for more subjective judicial sentencing under the SRA, despite the act's emphasis on "structuring" judicial discretion,[26] than existed beforehand. While I agree with the majority that a judge should have great latitude in the exercise of sentencing discretion, there must be some standard against which a judge may measure the instant violation when finding "onerousness".

Since the trial court made neither findings nor conclusions with respect to the onerousness of the violation, the case should be remanded to allow consideration of this issue. To avoid an argument based on vagueness and lack of standards, I would require a finding of onerousness be based on a proportionality review. The prosecutor may present statewide crime statistics in support of its request for an exceptional sentence. Alternatively, the Washington Association of Prosecuting Attorneys may elect to develop statewide guidelines against which drug violations may be measured. While this may present some additional burden on the State, this should be measured against the stated purposes of the SRA and the additional months or years that a defendant may, arbitrarily, be sentenced to serve.

---

[26]See *Shove*, 113 Wn.2d at 89.

My resolution gives effect to the language of the statute and provides necessary standards for application. I would affirm the Court of Appeals decision to remand this matter for resentencing.

UTTER and JOHNSON, JJ., concur with MADSEN, J.