# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53365-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| TROY C. RESTVEDT, | |
| Appellant. | |

MAXA, J. – Troy Restvedt appeals his convictions of resisting arrest and violating a Lewis County burn ban resolution (Resolution 248), which prohibited all fires in unincorporated Lewis County. The city of Centralia also had implemented a burn ban.

The convictions arose from an incident in which police officers entered the private backyard of Restvedt's residence in Centralia without a warrant because they observed a fire in violation of the burn ban. The trial court denied Restvedt's motion to suppress evidence related to the entry based on the emergency aid function of the community caretaking exception to the warrant requirement.

We hold that (1) the trial court erred in denying Restvedt's motion to suppress because the State's warrantless entry into his backyard was a pretext for a criminal investigation; (2) the State did not present sufficient evidence to convict Restvedt of resisting arrest because his arrest was unlawful; and (3) as the State concedes, the State did not present sufficient evidence to

convict Restvedt of violating Resolution 248 because his residence was not in unincorporated in Lewis County.

Accordingly, we reverse the trial court's order denying Restvedt's suppression motion and remand for the trial court to dismiss Restvedt's convictions for resisting arrest and violating Lewis County Resolution 248.

FACTS

*Arrest of Restvedt*

In August 2018, the Lewis County Board of County Commissioners and Lewis County Fire Marshal passed Resolution 248, which expanded preexisting burn restrictions for all of unincorporated Lewis County. The City of Centralia also instituted a total burn ban.

On August 17, 2018, the local fire department was called to Restvedt's residence in Centralia because of a report of an illegal burn. The person the fire department contacted responded aggressively and acted like he did not know that a burn ban was in effect.

Later, Centralia police officers Andrew Huerta and John Dorff responded to another report of an illegal burn at Restvedt's residence. When they arrived, the officers smelled wood-burning smoke and saw smoke coming from the backyard area of the property. After walking to the backyard area, they saw a fire when looking in between two tarps that blocked the view of the area. The officers entered the area and encountered a man later identified as Restvedt and another man sitting by a small fire.

Huerta advised Restvedt that there was a burn ban in effect and asked him to extinguish the fire. Restvedt became agitated and began to argue with Huerta about the fire. Restvedt eventually dumped two buckets of water on the fire while continuing to argue.

Huerta then asked Restvedt for his name. Restvedt responded by cursing at Huerta and ordering the officers off his property. Both officers informed Restvedt that he was under arrest because of the fire. Huerta attempted to handcuff Restvedt, but Restvedt backed away and swatted at Huerta's hands. Restvedt fell, and Huerta finally was able to handcuff him.

The State charged Restvedt with third degree assault, resisting arrest, and violating Lewis County Resolution 248.

*Motion to Suppress and Dismiss Charges*

Before trial, Restvedt filed a motion to suppress under CrR 3.6 and to dismiss the charges against him. He argued that the officers' warrantless entry into his backyard, which he claimed was a constitutionally protected area, was unlawful. He also argued that no exception to the warrant applied. Finally, he argued that because his arrest was illegal, he could not be convicted of resisting arrest. The State responded that the officers lawfully entered Restvedt's backyard pursuant to the emergency/community caretaking exception to the warrant requirement. The State did not make any other argument as to why the entry into Restvedt's backyard was lawful.

The trial court conducted a CrR 3.6 hearing. The State presented testimony from Huerta and Dorff. Huerta confirmed that there was a total burn ban in effect on the day of the incident. He stated that he was dispatched to Restvedt's property because the fire department had reported a possible burn there. According to dispatch, the fire department previously had asked Restvedt to put out the fire, and he had responded in an aggressive manner.

Huerta testified that when he and Dorff arrived at Restvedt's property they could smell and see smoke, and Dorff saw a fire in the backyard area. Huerta stated at that point he could not leave because of the burn ban. The officers then entered the area and contacted Restvedt and another man. Huerta testified that he went onto Restvedt's property because "I wanted

3

[Restvedt] to put the fire out due to the high risk of fire, due to the high risk of fire season, I wanted to prevent a fire in the area." Report of Proceedings (RP) at 11. He was concerned that the fire might spread to Seminary Hill, a forested area that was only 15 to 20 feet from Restvedt's property. He believed that the fire on Restvedt's property was a violation of the burn ban.

Huerta stated that when he first approached the property, he did not intend to place Restvedt under arrest. Instead, he merely wanted to "have [Restvedt] comply with the fire department like they asked previously." RP at 13. However, he admitted that he told Restvedt that he could either put the fire out or be arrested.

Huerta eventually asked Restvedt for his name, because "when I was going to criminally cite him for the -- if I was to criminally cite him for the reckless burning, then I know who I would have had contact with." RP at 12. Restvedt responded by stating "F*** you and get the f*** off my property." RP at 13. Huerta believed that Restvedt was not going to comply with the investigation. He then decided to place Restvedt in custody for the illegal burn.

On cross-examination, Huerta acknowledged that the officers arrived without lights and sirens and that they were not prepared to battle a fire. They did not request backup from the fire department. They did not bring fire extinguishers when they approached the property. Huerta admitted that there was no reason for him to believe that there was an emergency going on. When he arrived to the call, he responded to dispatch with a code indicating that there was no emergency and that things were under control.

Dorff testified that he was dispatched to Restvedt's property because of a report of an illegal fire. When he arrived he smelled smoke, and at that point he could not leave "[b]ecause there was a burn ban in effect and my job is to enforce the laws or educate people on the laws."

4

RP at 37. Dorff "believed there was an illegal fire going on" because of the burn ban. RP at 44. Dorff then saw the fire through a gap in tarps that were shielding the backyard area. Dorff and Huerta entered the backyard area and located the fire.

After entering the backyard, Dorff observed dry wood and debris and a compost pile containing dry leaves near the fire. The fire also was close to the Seminary Hill nature preserve, and Dorff was concerned about the nearby fir trees catching fire because it was so dry.

On cross-examination, Dorff stated that he could enter Restvedt's property because "I have the authority to enforce laws and when there's a law being broken I go and investigate it." RP at 46. He also testified that he "had probable cause to believe that they were in violation of the burn ban." RP at 46.

The trial court denied Restvedt's motion to suppress and dismiss. The court stated its reasoning in an oral ruling that the officers' entry onto Restvedt's property was justified under the community caretaking exception to the warrant requirement. The court entered written findings of fact consistent with the facts stated above, and entered the following conclusions of law:

> 2.1 The officers had a legitimate emergency concern in ensuring the defendant's fire was out during a county-wide burn ban.
> 2.2 The facts surrounding the fire department's report to dispatch and the smell of smoke the officers noticed when they got out of their vehicle was enough to justify the warrantless entry to the back part of the defendant's yard where the fire pit was located.

CP at 103.

*Conviction*

The facts outlined above were presented at trial. The jury convicted Restvedt of resisting arrest and violating Lewis County Resolution 248. The jury acquitted him of third degree assault.

5

Restvedt appeals the trial court's order denying his suppression motion and his convictions.

ANALYSIS

A.    EMERGENCY AID FUNCTION OF COMMUNITY CARETAKING EXCEPTION

Restvedt argues that the trial court erred in denying his CrR 3.6 motion to suppress based on a ruling that the emergency aid function of the community caretaking exception to the warrant requirement was applicable to Huerta's and Dorff's warrantless entry into the backyard area of his residence. We agree.

1.    Standard of Review

We review the denial of a motion to suppress to determine whether substantial evidence supports the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law. *State v. Boisselle*, 194 Wn.2d 1, 14, 448 P.3d 19 (2019). Here, Restvedt did not assign error to any of the trial court's findings of fact. Therefore, those findings are verities on appeal. *State v. Escalante*, 195 Wn.2d 526, 531, 461 P.3d 1183 (2020). We review de novo the trial court's conclusions of law. *Boisselle*, 194 Wn.2d at 14.

2.    Community Caretaking Exception

Article I, section 7 of the Washington Constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their . . . houses." Under these provisions, a person's home receives special constitutional protection. *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). This protection generally extends to the curtilage of a home that is not impliedly open to the public, because the curtilage is intimately tied to the home. *State v. Ross*, 141 Wn.2d 304, 312, 4 P.3d 130 (2000). This protection may

include a yard area not open to the public. *See State v. Hoke*, 72 Wn. App. 869, 873-75, 866

P.2d 670 (1994). As a result a warrant generally is required for law enforcement to enter a

person's residence or curtilage not open to the public. *State v. Hinshaw*, 149 Wn. App. 747, 750,

205 P.3d 178 (2009) (residence); *Ross*, 141 Wn.2d at 312 (curtilage).

One exception to the warrant requirement is the community caretaking exception.

*Boisselle*, 194 Wn.2d at 10. "This exception recognizes that law enforcement officers are 'jacks

of all trades' and frequently engage in community caretaking functions that are unrelated to the

detection and investigation of crime." *Id.* Officers may "make a limited invasion of

constitutionally protected privacy rights" when necessary to perform those community

caretaking functions. *Id.* The exception encompasses two functions: routine checks on health

and safety and rendering emergency aid. *Id.* at 11.

The threshold question for application of the community caretaking exception is whether

the officers' conduct was a pretext for a criminal investigation. *Id*. at 11, 14-15. For the

exception to apply, the officer's actions must be " 'totally divorced' from the detection and

investigation of criminal activity." *Id.* at 11 (quoting *State v. Kinzy*, 141 Wn. 2d 373, 385, 5 P.3d

668 (2000)). "When officers act to uncover criminal activity, their actions are of the very type

that article I, section 7's warrant requirement is directed." *Boisselle*, 194 Wn.2d at 16.

The second step in the analysis depends on which function the officer was utilizing. *Id.*

Here, the trial court relied on the emergency aid function. The court in *Boisselle* adopted an

amended test to determine when the emergency aid function of the community caretaking

exception applies:

> (1) the officer subjectively believed that an emergency existed requiring that he or she
> provide immediate assistance to protect or preserve life or property, or to prevent serious
> injury, (2) a reasonable person in the same situation would similarly believe that there

was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.

*Id*. at 14.  This amended test "make[s] clear that there must be a present emergency for the emergency aid function test to apply."  *Id.*

Finally, if the officer's activity satisfies the emergency aid function test, the court determines whether the activity was reasonable.  *Id.* at 11-12.  The court must also weigh the public's interest in having law enforcement perform a community caretaking function against the citizen's privacy interest.  *Id*. at 12.

3.    Pretext Analysis

Restvedt argues that Huerta's and Dorff's warrantless entry into his backyard was a pretext for a criminal investigation.  The State contends that the entry was motivated by an ongoing emergency.  We agree with Restvedt.

Whether an officer's alleged community caretaking activity is a pretext for a criminal investigation depends on the totality of the circumstances.  *Boisselle*, 194 Wn.2d at 15.  The court should consider " 'both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior.' "  *Id.* (quoting *State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999).

In *Boisselle*, two officers went to the defendant's residence because of anonymous calls reporting a crime.  194 Wn.2d at 15.  They noticed a smell that could be from a decomposing body, and they wanted to determine whether a crime had been committed or if a crime victim was inside.  *Id.*  They also were informed that the residence might be associated with a homicide investigation.  *Id.*  The officers had suspicions that a crime had taken place, and they decided to enter and make a warrantless entry and search of the residence – nearly two hours after they had arrived.  *Id.*

The Supreme Court held that law enforcement's warrantless entry into and search of the defendant's residence was pretextual. *Id*. at 16-17. The court stated:

> Taken together, these facts demonstrate that the officers were suspicious, if not convinced, that a crime had taken place. *Because of the officers' significant suspicions, the search of [the defendant's] home was necessarily associated with the detection and investigation of criminal activity*. . . . While the officers purportedly entered [the defendant's] home to render aid or assistance, *the officers were not solely motivated by a perceived need to provide immediate aid*. Indeed, the trial court found that the officers "were not able to confirm an immediate emergency existed." Instead, the officers sought to perform their official duties to uncover whether a crime had taken place and whether a crime victim was located inside [the defendant's] home.

*Id.* at 16 (emphasis added) (citations omitted).

The court concluded,

> Because [1] the officers had significant suspicions of criminal activity, [2] the officers were conducting a criminal investigation, and [3] there was no present emergency, it was objectively unreasonable for the officers to conduct a warrantless search of [the defendant's] home. Consequently, it appears that the officers used the emergency aid community caretaking function as a mere pretense for an evidentiary search.

*Id*.

Here, the evidence showed that Huerta and Dorff had a legitimate concern that the fire might spread to the trees in the nearby Seminary Hill nature area. The trial court made findings that there were dried leaves and flammable construction material near the fire and that the trees on Seminary Hill were only 15-20 feet away from the fire. These findings arguably support the trial court's conclusion that "[t]he officers had a legitimate emergency concern in ensuring the defendant's fire was out during a county-wide burn ban." CP at 103. However, the officers' observations were made only after they had entered Restvedt's property. Therefore, these findings and the conclusion do not address whether that entry was lawful.

The trial court's ultimate conclusion that the officer's entry onto Restvedt's property was justified depends on the threshold question of whether the entry was a pretext for a criminal investigation. *Boisselle*, 194 Wn.2d at 11. The trial court did not specifically address this question.

The court in *Boisselle* stated that to avoid a finding of pretext, the officers' actions must be (1) " '*totally divorced*,' from the detection and investigation of criminal activity," *Id.* at 11 (emphasis added) (quoting *Kinzy*, 141 Wn.2d at 385); and (2) "*solely* motivated by a perceived need to provide immediate aid." *Id.* at 16 (emphasis added). These requirements are not satisfied here.

The facts in this case are similar to those in *Boisselle*. First, as in *Boisselle*, the record reflects that Huerta and Dorff "had significant suspicions of criminal activity." *Id.* at 16. Law enforcement involvement began because of a 911 call from the fire department reporting an illegal fire at Restvedt's residence. Both officers were aware of the burn ban, smelled wood-burning smoke upon arriving at Restvedt's home, and saw a fire the backyard area. Huerta stated at that point he could not leave because of the burn ban. Dorff stated that he could not leave "[b]ecause there was a burn ban in effect and my job is to enforce the laws or educate people on the laws." RP at 37. Before he entered the property, Dorff "believed there was an illegal fire going on" because of the burn ban. RP at 44. Dorff testified that he had authority to enter Restvedt's property because he had probable cause to believe that Restvedt was violating the burn ban.

Second, as in *Boisselle*, the officers "were conducting a criminal investigation." 194 Wn.2d at 16. Dorff stated that he could enter Restvedt's property because he had authority to

10

enforce the law and "when there's a law being broken I go and investigate it." RP at 46. The officers entered Restvedt's backyard to investigate whether he was in fact violating the burn ban.

Third, as in *Boisselle*, the record shows that there was "no present emergency" at Restvedt's residence that required immediate assistance. 194 Wn.2d at 16. Huerta testified that there was no emergency going on when he responded to the call. The officers arrived at the scene without lights or sirens, did not request backup from the fire department, and approached the property without fire extinguishers. And when Huerta arrived, he reported to dispatch that there was no emergency and that things were under control. The dissent claims that the officers were addressing an emergency situation, but the evidence simply does not support that claim.

The State argues that Dorff's testimony regarding his authority to enforce the law and his belief that when a law is broken he investigates it should not negate Huerta's testimony that his main concern was safety and that he simply wanted Restvedt to put out the fire. However, both officers were dispatched to Restvedt's residence to investigate an unlawful fire. In addition, both officers entered Restvedt's property together, and there is no question based on Dorff's testimony and even based on Huerta's testimony that providing emergency aid was not the *sole* motivation for their entry.[1]

Because the officer's actions were not totally divorced from the detection and investigation of criminal activity, we conclude that the warrantless entry into Restvedt's backyard was a pretext for a criminal investigation and therefore did not fall within the

---

[1] The dissent claims that we are imputing Huerta's motivation to both officers. Not so. Although Dorf testified that he was concerned about the fire spreading, the record is clear that this concern was not his only motivation for entering Restvedt's property and he believed that there was no emergency. In any event, we disagree that a warrantless entry onto property by two officers is justified when one officer enters with the purpose of community caretaking while the other clearly is entering to investigate a crime.

11

emergency function of the community caretaking exception to the warrant. The officers' entry was not *solely* motivated by a perceived need to provide immediate emergency aid.

Accordingly, we hold that the trial court erred in ruling that the emergency aid function of the community caretaking exception applied to the officers' warrantless search.

4.    State's Proposed Burn Ban Exception to *Boisselle*

The State argues that we should create a blanket exception for burn ban investigations to the rule in *Boisselle* that for the community caretaking exception to apply, a warrantless entry must be totally divorced from a criminal investigation. The State claims that under the rule as expressed in *Boisselle*, law enforcement could never enter private property without a warrant to address an emergency fire when a burn ban is in place. The State urges this court to rule that *Boisselle* is incorrect and harmful in this context.

However, once the Supreme Court has decided an issue of state law, that interpretation is binding on all lower courts until it is overturned by the Supreme Court. *State v. Jones*, 182 Wn.2d 1, 5, 338 P.3d 278 (2014). Therefore, we are precluded from creating an exception to the rule stated in *Boisselle*.

5.    Alternative Courses of Action

It is important to recognize that if the officers genuinely were interested only in the risk of the fire spreading, they had a readily available alternative: obtaining a warrant. One officer could have worked on requesting a warrant while the other officer kept a close eye – from a public street – on the fire. The officers also could have asked for permission to enter and talk to Restvedt about the danger of maintaining the fire, as the fire department previously had attempted, rather that entering without permission.

Further, the community caretaking exception is not the only exception to the warrant requirement. If officers were addressing a fire that was out of control, the exigent circumstances exception to the warrant requirement could have applied. *See State v. Rawley*, 13 Wn. App. 2d 474, 479, 466 P.3d 784 (2020). But here there was no evidence of any exigent circumstances.

6. Summary

We hold that the trial court erred in ruling that the officers' entry onto Restvedt's property was lawful under the emergency aid function of the community caretaking exception to the warrant requirement. Therefore, we reverse the trial court's denial of Restvedt's suppression motion.

B. SUFFICIENCY OF THE EVIDENCE – RESISTING ARREST

Restvedt argues that the State presented insufficient evidence to convict him of resisting arrest because the State failed to show that Restvedt was resisting a *lawful* arrest. He argues that his arrest was unlawful because the officers' warrantless entry of his backyard was unlawful. We agree.

When evaluating the sufficiency of evidence for a conviction, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). We will assume the truth of the State's evidence and all reasonable inferences drawn from that evidence when evaluating whether sufficient evidence exists. *Id*. at 106.

A person is guilty of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from *lawfully* arresting him. RCW 9A.76.040. The State's only argument regarding sufficiency of evidence is that the officers' entry onto Restvedt's property was lawful,

and therefore the arrest was lawful. But we have held above that the entry was not lawful. Therefore, the State's argument fails. And the State does not argue that the arrest was lawful even if the entry was unlawful. *See State v. Solberg*, 122 Wn.2d 688, 696-97, 861 P.2d 460 (1993) (stating that "in the absence of exigent circumstances, police may not make a warrantless arrest after a nonconsensual entry into a suspect's home.").

Accordingly, we hold that the State failed to present sufficient evidence to show that Restvedt resisted a lawful arrest.

C.      SUFFICIENCY OF THE EVIDENCE – LEWIS COUNTY RESOLUTION 248

Restvedt argues, and the State concedes, that sufficient evidence does not support his conviction of violating Lewis County Resolution 248. We accept the State's concession and reverse Restvedt's conviction.

In August of 2018, the Lewis County Board of County Commissioners and Lewis County Fire Marshal passed Resolution 248, which expanded the burn restrictions "for all of *unincorporated* Lewis County, Washington." CP at 94 (emphasis added). The State charged Restvedt with violating Resolution 248.

However, it is undisputed that Restvedt's residence was in Centralia, an *incorporated* city in Lewis County. Therefore, Resolution 248 did not apply to Restvedt's fire. Centralia also implemented a total burn ban, but the State did not charge Restvedt with violating Centralia's burn ban.

We conclude that sufficient evidence does not support Restvedt's conviction of violating Lewis County Resolution 248.

14

CONCLUSION

We reverse the trial court's order denying Restvedt's suppression motion related to the warrantless entry into Restvedt's backyard and remand for the trial court to dismiss Restvedt's convictions for resisting arrest and violating Lewis County Resolution 248.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

I concur:

_____
WORSWICK, P.J.

GLASGOW, J., concurring in part and dissenting in part—A drought combined with unusually high temperatures in summer 2018 created very dry conditions in western Washington. Fire danger was particularly high that summer. There was at least one wildfire on the Olympic Peninsula, an unusual event west of the Cascades. That wildfire became large enough to create smoky conditions in Seattle.[2] Both Lewis County and the city of Centralia, like almost all local governments, had total burn bans in place.

Troy C. Restvedt's property backed up against Seminary Hill, an area dense with large trees.



Ex. 1 (excerpt).

---

[2] https://wasmoke.blogspot.com/2018/08/wa-keeps-accumulating-smoke-through.html?m=1.



Ex. 4 (excerpt).

Officers Andrew Huerta and John Dorff responded to a call about a fire on Restvedt's property. The fire department had already told Restvedt earlier that same day that he needed to put out his backyard fire to comply with the burn ban. When there was a new report of a fire on Restvedt's property, the fire department contacted police because their attempts to get Restvedt to stop burning had been unsuccessful and his response had been aggressive.

When the officers arrived they could smell smoke coming from Restvedt's backyard. Officer Huerta testified that "I was made aware by Officer Dorff that he [had] actually seen the fire coming from that area. I saw the smoke as well." Verbatim Report of Proceedings (VRP) (Oct. 31, 2018) at 10. Officer Dorff testified that he smelled and saw smoke coming from the backyard.

Officer Huerta also testified that there was not a fence or a gate between where he parked his vehicle and the place where he first contacted Restvedt. The officers walked down the gravel driveway on the south side of the house to the side of the backyard. Officer Dorff testified that as he approached the backyard from the south, he could see the fire through a gap in two hanging tarps.

The officers were aware of the dry conditions, and Huerta was concerned that the fire could spread to the large nearby trees. Huerta said that his purpose for going onto Restvedt's property was to get him to put out the fire because of the high fire risk. He "wanted to prevent a fire in the area." *Id.* at 11.

Officer Dorff testified that he could not ignore the backyard fire because "there was a burn ban in effect and my job is to enforce the laws or educate people on the laws." *Id.* at 37. He was aware that the Seminary Hill was a "very thick forest [of] fir trees." *Id.* at 38. He was concerned that if they caught fire, those trees would "burn as if they have gasoline on them." *Id.* at 39. He also said that he had authority to investigate and enforce the law when he is aware that the law is being broken, but his "primary reason" for entering the backyard was concern about the risk of fire. *Id.* at 42.[3]

The trial court concluded that given what the officers knew when they arrived, that there was a burn ban because of severe fire danger, that Restvedt was ignoring a fire department demand that he not burn fires in his backyard, that the fire department had asked for police assistance, that there were large trees nearby, and that they smelled smoke as soon as they arrived, this warranted them walking on the gravel driveway toward the backyard. Once they were near the backyard, they saw the fire through hanging tarps. All of this warranted them entering the backyard because they had "a legitimate emergency concern in ensuring the defendant's fire was out during a county-wide burn ban" under the community caretaking exception to the warrant requirement. Clerk's Papers at 103.

---

[3] Once they were inside the backyard, the officers testified that there was a compost pile full of dry leaves that caused them additional concern regarding fire danger.

I disagree with the majority's conclusion that the officers had to have a warrant to validly enter Restvedt's backyard for two reasons.

First, I disagree with the majority's assessment of the nature of the risk involved. Under *State v. Boisselle*, 194 Wn.2d 1, 14, 448 P.3d 19 (2020), the emergency aid function of the community caretaking exception to the warrant requirement applies where three requirements are met. The officer must have "subjectively believed that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life *or property, or to prevent serious injury*," a reasonable person would agree such an emergency existed, and there was a reasonable connection between the emergency and the place entered. *Id.* (emphasis added).

Here, there was a significant fire danger in western Washington in summer 2018, there were large trees in close proximity, and a fire in those trees could quickly threaten the safety of nearby neighbors also living very near the Seminary Hill tree line. Restvedt had ignored a fire department demand made earlier that day that he not burn anything on his property, and officers could not realistically ensure the fire was truly extinguished without entering the property in light of Restvedt's prior noncompliance. All of these facts supported a reasonable belief that there was an emergent threat to property and to nearby neighbors' safety, especially considering how fast a fire can spread through large, dry trees like the ones depicted in exhibits 1 and 4, *supra*. I would affirm the trial court's conclusion that this situation was emergent enough to warrant entry onto the property for the community caretaking function of ensuring that the fire was out. This was exactly what the officers did as soon as they entered the backyard—they immediately insisted that Restvedt put out the fire by dousing it with two buckets of water.

Second, I disagree with the majority's expansion of *Boisselle*'s pretext analysis to impute one officer's thinking to all officers involved. Nothing in *Boisselle* requires us to do so, *see* 194

Wn.2d. at 14-18, and I would not expand *Boisselle* beyond its express requirements. Here, Officer Huerta testified to a single motivation for entering the backyard, he "wanted to prevent a fire in the area." VRP (Oct. 31, 2018) at 11. There is no testimony or other evidence indicating that Officer Huerta had any motive other than to ensure safety. Under *Boisselle*, he was not acting under a pretext of investigation and he legitimately entered Restvedt's backyard. His legitimate presence should not be undermined by Officer Dorff's belief that he could enforce the burn ban, which, incidentally, could easily have meant simply putting out the fire.

Moreover, the facts of this case are significantly different from *Boisselle*, and I would limit *Boisselle*'s pretext analysis to cases presenting similar facts. In *Boisselle*, the officers waited nearly two hours after their arrival to enter the home at issue in that case. 194 Wn.2d at 5-6. The officers did not think there was any immediate peril. *Id.* Instead, the officers suspected that there was a dead body in the home. *Id.* Here, in contrast, the officers went to Restvedt's property at the request of the fire department and they entered the backyard immediately after they arrived and realized there was a fire burning. These facts are a far cry from those presented in *Boisselle.*

I respectfully dissent and would instead affirm the trial court's denial of Restvedt's suppression motion. I would affirm Restvedt's conviction for resisting arrest. I agree with the State's concession and the majority's conclusion that sufficient evidence does not support Restvedt's conviction of violating Lewis County Resolution No. 248.


Glasgow, J.